IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LVL CO., LLC,                                  :
                                               :
                        Plaintiff,             :        CIVIL ACTION NO. 19-3406
                                               :
            v.                                 :
                                               :
ABRAHAM ATIYEH, individually, d/b/a            :
the owner/president/manager of                 :
Valley Realty Holdings Limited, in both his    :
official and individual/personal capacities;   :
VALLEY REALTY HOLDINGS LIMITED;                :
NIMITA KAPOOR ATIYEH, individually,            :
d/b/a the owner/principal/manager of           :
Flashpoint, Flashpoint1, and Flash Point       :
Advertising LLC, in both her official and      :
individual/personal capacities; PRIYA          :
ATIYEH, individually, d/b/a the                :
owner/principal/manager of Flashpoint,         :
Flashpoint1, and Flash Point Advertising,      :
LLC, in both her official and                  :
individual/personal capacities, and            :
FLASHPOINT, FLASHPOINT1,                       :
FLASHPOINT ADVERTISING LLC,                    :
                                               :
                        Defendants.            :

## MEMORANDUM OPINION

Smith, J.                                                      June 30, 2020

Contracts are not drafted for when things go right. Here, plaintiff, an established outdoor advertising business, paid $15,000,000 for defendant/seller's billboard business. As part of the deal, the seller and his company were allowed to retain ownership of several billboards, which could only be used to advertise businesses owned by the seller, *i.e.* could not be leased for advertising by third parties. The agreement included a covenant not to compete, to preclude the seller from competing with plaintiff's outdoor advertising business, as well as a right of first refusal if seller wished to sell any of the retained billboards.

Seller's wife was and is an accomplished and successful businesswoman in her own right, but she had never been in the outdoor advertising business. Nevertheless, she agreed to pay $6,000,000 to her husband for the retained billboards, and she signed a promissory note payable to him for the full $6,000,000 (towards which no payment has ever been made). She then began aggressively marketing the billboards for advertising by third parties.

The parties agree that if the seller sold these advertisements to third parties himself, he would have violated the restrictive covenants. However, the wife maintains that she is a separate entity from her husband, she receives no help from her husband in running her company, and that neither she nor her daughter were parties to the restrictive covenants. This case therefore involves complex and interesting issues relating to whether or not one who agrees to certain restrictive covenants can also bind his or her family members to the covenants, and under what circumstances this can occur, if at all.

The plaintiff has moved for a preliminary injunction and declaratory judgment against the various defendants, which also include the seller's wife, their daughter, and several other companies formed by the seller's wife for the purpose of engaging in the outdoor advertising business. The plaintiff seeks to have the court enjoin the seller and his company from assisting, setting up, and generally being engaged in, and/or providing advice or services to the other defendants. The plaintiff also requests that the court enjoin the seller's wife, their daughter, and the wife's companies from receiving assistance from the seller and his company, and for these defendants to stop engaging in any outdoor advertising business using the billboards received or purchased from the seller and his company. The plaintiff also seeks declaratory judgment on several related issues.

In resolving this motion for a preliminary injunction and declaratory judgment, the court must navigate the intricate balance between the rights of the husband and wife to transact with each other and run their own independent businesses, versus the plaintiff's right to have the court enforce the non-compete provisions for which it bargained. After thoroughly reviewing all evidence in the record and considering the parties' arguments in support of their respective positions, the court finds that the plaintiff is entitled to preliminary injunctive relief because it has shown that it is likely to succeed on the merits of several of its causes of action and it has also demonstrated irreparable harm to its business. In addition, balancing the non-moving parties' interests and the public interest supports granting the motion. Accordingly, the court will grant the motion for a preliminary injunction and will direct the defendants to immediately cease selling advertisements to third parties.

## I.        PROCEDURAL HISTORY

The plaintiff, LVL Co., LLC ("LVL"), commenced this action on July 30, 2019, by filing a complaint against the defendants, Abraham Atiyeh ("Mr. Atiyeh"), Nimita Kapoor Atiyeh ("Mrs. Atiyeh"), Priya Atiyeh, Flashpoint, Flashpoint1, Flash Point Advertising, LLC (Mrs. Atiyeh, Priya Atiyeh, and the Flashpoint entities are hereinafter collectively referred to as the "Flashpoint Defendants"), and Valley Realty Holdings Limited ("Valley"). Doc. No. 1. In the complaint, LVL avers that it purchased certain assets from Mr. Atiyeh and Valley in August 2015 through an asset purchase agreement. Compl. at ¶ 12. At the time that LVL purchased these assets, Mr. Atiyeh and Valley were engaged in the outdoor advertising business and related operations throughout the Commonwealth of Pennsylvania. *Id.* at ¶ 14.

As an integral part of the Asset Purchase Agreement, LVL desired certain restrictive covenants from Mr. Atiyeh and Valley, as specified in Article VII of the agreement. *Id.* at ¶ 18.

These restrictive covenants essentially provided that Mr. Atiyeh and Valley would not, for a period of twenty years,

> directly or indirectly, on his own behalf or on behalf of or in conjunction with any person, business, firm, company, or other entity, set up, join, become employed by, be engaged in, or provide advice or services to any enterprise and/or individual which is involved in directly or indirectly, the outdoor advertising business or which competes with, interferes with, or otherwise disturbs LVL's outdoor advertising business.

*Id.* at ¶ 19 (citing section 7.1 of agreement). The restrictive covenants were restricted to "signs located or planned to be located in any areas in the United States of America that are within a 50 mile radius of any outdoor advertising structure owned and/or leased by LVL." *Id.* at ¶ 20 (citing section 7.1 of agreement).

LVL maintains that Mr. Atiyeh and Valley violated these restrictive covenants in May 2019, when they "sold" the billboard inventory that they had retained under the asset purchase agreement, to Mrs. Atiyeh, and/or Priya Atiyeh, and/or the Flashpoint entities, which are businesses owned and managed by them. *Id.* at ¶ 35. LVL maintains that this "sale" was not a bona fide, arms-length transaction. *Id.* at ¶ 43. Following the "sale," LVL avers that Mrs. Atiyeh and Priya Atiyeh engaged in the outdoor advertising business by advertising the billboards they acquired from Mr. Atiyeh and Valley for rent, and that these billboards are all located within 50 miles of LVL's billboards. *Id.* at ¶ 44. LVL alleges that because of the "sale" and the competition thereafter, all defendants violated the restrictive covenants contained in the asset purchase agreement. *Id.* at ¶ 46. They further maintain that the defendants "continue to actively advertise and solicit billboards for rent in violation of the restrictive covenants of the Asset Purchase Agreement, and using billboards and business set up in violation of same." *Id.* at ¶ 53.

Based on these allegations, LVL brings claims of breach of contract against Mr. Atiyeh and Valley (Count I), intentional interference with performance of contract by a third person

against the Flashpoint Defendants (Count IV), and conspiracy against all defendants (Count V). *Id.* at ¶¶ 54–84. As relief, the plaintiff seeks a declaratory judgment (Count II), a permanent injunction (Count III), damages, and other such equitable relief that the court deems fair and just. *Id.* at 15–16, 17–18, 19–20.

On August 27, 2019, LVL filed a motion for a preliminary injunction against all defendants. Doc. No. 12. In the motion, LVL sought the following relief:

> (1) A preliminary injunction ordering [Mr. Atiyeh and Valley], and all entities owned or controlled by either of them, to immediately cease and desist from assisting, setting up, joining, becoming employed by, being engaged in, and/or providing advice or services to [the Flashpoint Defendants] with respect to any outdoor advertising business or competition with, interference with, or disturbance of [LVL] in the conduct of [LVL's] outdoor advertising business[;]
>
> (2) A preliminary injunction ordering [the Flashpoint Defendants] to immediately cease and desist from seeking and/or receiving any set up, guidance, advice, assistance, employment or services of any kind from [Mr. Atiyeh] and Valley, or from any entity owned or controlled by them, with respect to any outdoor advertising business or competition with, interference with, or disturbance of [LVL] in the conduct of [LVL's] outdoor advertising business, and to further immediately cease and desist from engaging in any outdoor advertising business using any billboards and/or assets received or purchased in any way from [Mr. Atiyeh] and Valley and any entity owned or controlled by either of them[; and]
>
> (3) An award to [LVL] of its reasonable attorney fees and costs associated with obtaining the remedies herein, in accordance with the parties' written agreement providing for same in Article VII, Section 7.4 of the Asset Purchase Agreement.

Pl.'s Mot. for Prelim. Inj. Contractually Agreed and Consented to by Defs. Atiyeh and Valley Realty Holdings Limited at 1–2, Doc. No. 12.

Mr. Atiyeh and Valley filed their opposition to the motion for preliminary injunction on September 16, 2019, as did the Flashpoint Defendants. Doc. Nos. 19, 20. The next day, the court held a telephone conference to discuss the scheduling for the motion for a preliminary injunction. After this conference, the court entered an order which, *inter alia*, (1) directed the parties to immediately commence with discovery related to the motion for a preliminary injunction, (2)

provided the parties with deadlines for filing proposed findings of facts and conclusions of law relating to the motion for a preliminary injunction, and (3) scheduled an evidentiary hearing on the motion for preliminary injunction to take place on November 14, 2019. Sept. 17, 2019 Order at 1–2, Doc. No. 23.

The Flashpoint Defendants filed their answer to the complaint on September 25, 2019. Doc. No. 24. On the same date, Mr. Atiyeh and Valley filed their answer to the complaint. Doc. No. 25. On November 6, 2019, the court entered another order, this time amending the previous scheduling order and (1) making it so that the parties were not required to file proposed findings of fact and conclusions of law by November 7, 2019, and (2) allowing, but not requiring, the parties to file trial memoranda of relevant law by November 14, 2019. Nov. 6, 2019 Order at 1–2, Doc. No. 34. On November 12, 2019, the court clarified the November 6, 2019 order to require the parties to file any trial memoranda by no later than November 13, 2019, at noon. Nov. 12, 2019 Order, Doc. No. 36.

On November 13, 2019, the Flashpoint Defendants filed a response in opposition to the motion for preliminary injunction. Doc. No. 37. The same day, LVL filed a memorandum of law relevant to its motion for preliminary injunction. Doc. No. 38. The next day, the court began the evidentiary hearing on the motion for preliminary injunction and this hearing lasted several days. *See* Doc. Nos. 40, 42, and 43. After the evidentiary hearing concluded, the court entered a scheduling order with regards to the parties filing proposed findings of fact and conclusions of law, which included a date for oral argument. Nov. 22, 2019 Order, Doc. No. 44.

Unfortunately, on a telephone conference with counsel on January 15, 2020, the parties notified the court that there had been a delay in obtaining the transcripts from the evidentiary hearing. Therefore, on January 16, 2020, the court entered an order denying the motion for the

preliminary injunction without prejudice, and setting a new schedule for the refiling of the preliminary injunction motion upon the receipt of the transcripts from the preliminary injunction hearing, as well as an updated schedule for the filing of the proposed findings of facts and conclusions of law, and a new oral argument date. Jan. 16, 2020 Order, Doc. No. 49. LVL filed the instant motion for preliminary injunction and declaratory judgment on February 6, 2020. Doc. No. 56.

In the instant motion for preliminary injunction, LVL requests similar injunctive relief and attorney fees to that previously requested. Pl.'s Renewed Mot. for Prelim. Inj. and Declaratory J. at 7–9, Doc. No. 56. LVL also requests relief declaring that

(1) . . . [Mr.] Atiyeh and Valley were bound by and are in breach of the restrictive covenants set forth in Article VII of the Asset Purchase Agreement;

(2) . . . [Mrs.] Atiyeh was bound by the terms of the restrictive covenants set forth in Article VII of the Asset Purchase Agreement, including the relief for breaches as set forth therein, because she acted in concert with [Mr.] Atiyeh and Valley when she entered into a Sales Agreement for the purchase of [Mr.] Atiyeh's interest in the billboard assets . . . with full knowledge of the terms of the restrictive covenants in the Asset Purchase Agreement;

(3) . . . [Mrs.] Atiyeh, as wife of [Mr.] Atiyeh, shall be adjudged to be a non-covenantor who benefitted from [Mr.] Atiyeh's contractual relationship with [LVL] and therefore was bound by the same restrictive covenants agreed to by [Mr.] Atiyeh, and was further bound by the provisions in Article VII of the Asset Purchase Agreement, which require the entry of a preliminary injunction in the event the non-compete provisions are violated;

(4) . . . [Mrs.] Atiyeh is in breach of the restrictive covenants set forth in Article VII of the Asset Purchase Agreement by engaging in the outdoor advertising business on billboards previously owned or controlled by [Mr.] Atiyeh and Valley, or entities over which he or they controlled;

(5) . . . the purported transfer of [Mr.] Atiyeh's interest in Manor Signs LLC and/or the billboards set forth on the list attached as Exhibit "A", from [Mr.] Atiyeh to [Mrs.] Atiyeh, was not a bona fide arms-length transaction and was merely a sham intended by Defendants to circumvent the non-compete provisions set forth in Article VII of the Asset Purchase Agreement, and is therefore null and void;

(6) . . . the terms of the Asset Purchase Agreement which provide for a right of first refusal in favor of [LVL] did not relieve Defendants of their obligation to comply with the non-compete provisions in Article VII of the Asset Purchase Agreement; and

(7) [LVL's] failure to exercise its right of first refusal to purchase the billboard assets is of no legal dispositive effect and does not excuse Defendants' failure to comply with the non-compete provisions in Article VII of the Asset Purchase Agreement.

*Id.* at 5–8.

In accordance with the court's January 16, 2020 order, LVL also filed their proposed findings of fact and conclusions of law, as well as a brief in support of their declaratory judgment request on March 2, 2020. Doc. Nos. 58, 59. On March 5, 2020, the Flashpoint Defendants and Mr. Atiyeh and Valley separately filed their responses in opposition to the motion for preliminary injunction and declaratory judgment. Doc. Nos. 60, 61. On April 1, 2020, the Flashpoint Defendants filed a memorandum of law in opposition to the motion for preliminary injunction and declaratory judgment. Doc. No. 62. On the same date, the Flashpoint Defendants also filed their own proposed findings of fact and conclusions of law. Doc. No. 63. On April 8, 2020, LVL filed a response in support of the motion for preliminary injunction. Doc. No. 65. Two days later, Mr. Atiyeh and Valley filed their response in opposition to the motion for declaratory judgment, and their own proposed findings of fact and conclusions of law. Doc. Nos. 65, 66.

On April 13, 2020, the Flashpoint Defendants filed a motion for leave to file a sur-reply in opposition to LVL's renewed motion for preliminary injunction and declaratory judgment. Doc. No. 67. The next day, the court held oral argument on the motion for preliminary injunction and declaratory judgment via telephone, in light of the COVID-19 pandemic and in an effort to maintain proper social distancing. Doc. No. 68. During oral argument, LVL indicated that it did

not oppose the Flashpoint Defendants' motion to file a sur-reply, so the court granted this motion and the Flashpoint Defendants filed the sur-reply. Doc. No. 70; Apr. 15, 2020 Order, Doc. No. 71.

On April 27, 2020, LVL filed a motion for leave to supplement the record for its renewed motion for preliminary injunction and declaratory judgment. Doc. No. 74. The court held a telephone conference to discuss this motion on May 4, 2020. Doc. No. 77. After the telephone conference, the court granted the motion to supplement the record to include the attached exhibits, but also provided for more time for the parties to file additional affidavits and additional proposed findings of fact and conclusions of law in light of LVL's supplemental records. May 4, 2020 Order, Doc. No. 78. On May 7, 2020, LVL filed an additional affidavit by Lois Arciszewski explaining and certifying the supplemental records, as well as supplemental proposed findings of fact and conclusions of law. Doc. Nos. 79, 80. On May 18, 2020, Mr. Atiyeh and Valley filed their own affidavit and supplemental findings of fact and conclusions of law. Doc. No. 82. The next day, the Flashpoint Defendants submitted additional findings of facts and conclusions of law, along with an additional declaration from Priya Atiyeh. Doc. No. 83. The evidentiary record is now closed, and the motion for preliminary injunction and declaratory judgment is now ripe for disposition.

## II.    FINDINGS OF FACT

After carefully considering all of the evidence presented during the evidentiary hearings as well as the evidence introduced and admitted since then, and after assigning such weight to the evidence as the court deemed proper and disregarding the testimony that the court found to lack credibility, the pertinent facts are as follows:

### A.    The Parties

1.      LVL is in the outdoor advertising space, as it is in the business of leasing and purchasing off-premises signs, also known as billboards. Compl. at ¶ 11, Doc. No. 1; Hr'g Ex. P-

2, Answer and Affirmative Defenses of Defs., Nimita Kapoor Atiyeh, Priya Atiyeh, Flashpoint, Flashpoint1, and Flash Point Advertising, LLC, to Pl.'s Compl. ("Flashpoint Defs.' Answer") at ¶ 11, Doc. No. 24; and Hr'g Ex. P-3, Resp. of Defs. Abraham Atiyeh and Valley Realty Holdings Limited to Pl.'s Compl. ("Mr. Atiyeh and Valley's Answer") at ¶ 11, Doc. No. 25.

2.      LVL is affiliated with Adams Outdoor Advertising Limited Partnership ("Adams"), which is also engaged in outdoor advertising and has a long-standing outdoor advertising operation in the Lehigh Valley area of Pennsylvania. *See* Hr'g Ex. P-12, Asset Purchase Agreement ("Agreement") at "Recitals" ¶ H, Bates #659; Tr. of Evidentiary Hr'g on Nov. 21, 2019 ("Nov. 21, 2019 Tr.") at 223:3–10, Doc. No. 54.

3.      Mr. and Mrs. Atiyeh are husband and wife, and they are Pennsylvania residents residing at 3660 Manor Road, Bethlehem, PA 18020. Compl. at ¶¶ 3, 5; Flashpoint Defs.' Answer at ¶¶ 3, 5; Mr. Atiyeh and Valley's Answer at ¶¶ 3, 5; Tr. of Evidentiary Hr'g on Nov. 19, 2019 ("Nov. 19, 2019 Tr.") at 121:14–16, Doc. No. 53.

4.      Mr. and Mrs. Atiyeh file their taxes jointly. Nov. 21, 2019 Tr. at 210:15–21.

5.      Priya Atiyeh is Mr. and Mrs. Atiyeh's adult daughter who also resides at 3660 Manor Road, Bethlehem, PA 18020, and is also a Pennsylvania resident. Compl. at ¶ 6; Flashpoint Defs.' Answer at ¶ 6; Mr. Atiyeh and Valley's Answer at ¶ 6; Dep. Testimony of Nimita Kapoor Atiyeh ("Mrs. Atiyeh Dep.") at 9:25, 10:8.

6.      Mr. Atiyeh is the principal, incorporator, and an officer of Valley. Hr'g Ex. P-6, Articles of Incorporation for Def. Valley; Hr'g Ex. P-9, Interrog. Answers of Def. Valley at #1.

7.      Mrs. Atiyeh formed Flash Point Advertising, LLC in April of 2019. Flash Point Advertising, LLC also does business as "Flashpoint" and "Flashpoint1" (collectively, the "Flashpoint entities"). Mrs. Atiyeh formed the Flashpoint entities to sell advertising on the

billboards that she acquired control of from Mr. Atiyeh and Valley through the purchase of Manor Signs, LLC and its subsidiaries. Mrs. Atiyeh Dep. at 25:5–12; Hr'g Ex. P-35, Flashpoint Billboard Media Kit – original; Hr'g Ex. P-75, Flashpoint Billboard Media Kit – updated / current; Nov. 19, 2019 Tr. at 170:11–171:4.

8.      Mrs. Atiyeh is the sole member of Flash Point Advertising, LLC, a non-publicly traded business that she owns and controls completely. Hr'g Ex. P-10, Interrog. Answers of Def. Nimita Kapoor Atiyeh ("Mrs. Atiyeh Interrog. Answers") at #6; Nov. 19, 2019 Tr. at 173:6–11.

9.      Flash Point Advertising, LLC has no employees. Mrs. Atiyeh Interrog. Answers at #7; Mrs. Atiyeh Dep. at 63:2–4.

10.     Priya Atiyeh is named as a "manager" of Flash Point Advertising, LLC on a written document as early as April 30, 2019. Hr'g Ex. P-38, Notice of Right of First Refusal – unredacted.

11.     Mrs. Atiyeh maintains that prior to this lawsuit, Priya Atiyeh was only helping out with the business as a "daughter . . . helping her mother as a daughter." Mrs. Atiyeh Dep. at 64:20–65:12. Now, Priyah Atiyeh is a subcontractor for the Flashpoint entities, and she has numerous jobs such as sending out bills, collecting bills, depositing the money, and conveying information to the accountant. *Id.*

12.     Flash Point Advertising, LLC's registered business address is a property owned by PAJ Ventures, LP, which Mr. Atiyeh manages as the leasing agent, located at 4260 Nazareth Pike, Bethlehem, PA 18020. Mrs. Atiyeh Dep. at 74:1–76:9; Compl. at ¶¶ 38, 39; Flashpoint Defs.' Answer at ¶ 39 (admitted in part); Mr. Atiyeh and Valley's Answer at ¶¶ 38–39 (admitted in part); Dep. Testimony of Abraham Atiyeh ("Mr. Atiyeh Dep.") at 69:5–16.

13.    Valley is the general partner of PAJ Ventures, LP, and Mr. Atiyeh is a limited partner of PAJ Ventures, LP. Hr'g Ex. P-34, PAJ Ventures, LP Certificate of Limited Partnership and Limited Partnership Agreement; Hr'g Ex. P-9, Interrog. Answers of Valley at #1.

### B.    The Asset Purchase Agreement

14.    On August 10, 2015, LVL as "Buyer" purchased certain assets from Mr. Atiyeh and Valley collectively as "Individual Seller" by way of an Asset Purchase Agreement (the "Agreement"). Agreement, Doc. No. 3-1.

15.    At the time of the Agreement, Mr. Atiyeh and Valley were engaged in the outdoor advertising business and related operations throughout the Commonwealth of Pennsylvania, through ownership and management of various business entities they owned jointly, which are listed in paragraph A of the Recitals to the Agreement. Agreement at "Recitals" ¶ A, Bates #658.

16.    Mr. Atiyeh described his profession with respect to outdoor advertising before the Agreement as one of a "billboard operator, professional," in which he engaged in the selling of outdoor advertising to third parties, on and off, for over 20 years. Mr. Atiyeh Dep. at 9:22–11:17; Nov. 21, 2019 Tr. at 107:2–15.

17.    In conjunction with those prior operations, Mr. Atiyeh and Valley owned real property, easements, easement rights, and leasehold interests, upon which they had built billboard structures and their appurtenances, or held future contingent rights to build such structures and appurtenances, and held or was in the process of obtaining permits and/or permissions to use these structures to engage and conduct their outdoor advertising business. Agreement at "Recitals" ¶¶ A–C, Bates #658.

18.     Mr. Atiyeh and Valley also owned or controlled three specified parcels of land upon which the owner granted LVL an easement for signage as part of the Agreement. Agreement at "Recitals" ¶ E, Bates #659.

19.     As part of the Agreement, LVL desired certain restrictive covenants from Mr. Atiyeh and Valley as specified in Article VII of the Agreement. Agreement at "Recitals" ¶ G, Bates #659; *see also* Compl. at ¶ 18; Mr. Atiyeh and Valley's Answer at ¶ 18.

20.     Mr. Atiyeh and Valley agreed in Article VII of the Agreement, entitled "Restrictive Covenants" that

> for a period of twenty (20) years after the First Closing date [Mr.] Atiyeh shall not, directly or indirectly, on his own behalf or on behalf of or in conjunction with any person, business, firm, company, or other entity[,] . . . set up, join, become employed by, be engaged in, or provide advice or services to any enterprise . . . and/or individual . . . which is involved in, directly or indirectly, the outdoor advertising business or which competes with, interferes with, or otherwise disturbs [LVL's ] . . . outdoor advertising business[.]

Agreement at § 7.1, Bates #674–75.

21.     Mr. Atiyeh and Valley agreed that because LVL's business is conducted nationwide, the restrictive covenants are reasonably restricted geographically to signs located or planned to be located in any areas in the United States of America that are within a 50-mile radius of any outdoor advertising structure owned and/or leased by LVL immediately following the transaction's First Closing. Agreement at § 7.1, Bates #675.

22.     Mr. Atiyeh and Valley further agreed that the restrictive covenants are reasonable with respect to their duration and the interests being protected by the restrictions, and that LVL had valid, valuable, and important interests to protect via the restrictive covenants, including but not limited to its relationships with clients/customers/property owners, the protection of

confidential information, and protection against unfair competition, and that the restrictive covenants are reasonable and necessary to protect those interests. Agreement at § 7.1, Bates #675.

23.     Mr. Atiyeh and Valley further agreed that the Agreement and all of the provisions thereof, including the Article VII restrictive covenants, "shall be binding upon and inure to the benefit of the parties and their respective successors and assigns." Agreement at § 14.4, Bates #688.

24.     Mr. Atiyeh and Valley expressly acknowledged, understood, and agreed "that the Purchase Price and other tangible and intangible consideration Seller is receiving is being provided by Buyer in exchange for Seller's agreement to the Restrictive Covenants contained in this <u>Article VII</u>." Agreement at § 7.3, Bates #676; *see also* Mr. Atiyeh Dep. at 58:6–16, 61:1–10.

25.     Per section 3.1 of the Agreement, LVL paid $15,000,000 in exchange for, *inter alia*, Mr. Atiyeh and Valley's agreement to the restrictive covenants in section 7.3 of the agreement. Agreement at § 3.1, Bates #663; Nov. 21, 2019 Tr. at 109:3–9.

26.     Mr. Atiyeh and Valley agreed that as further and independent consideration for the restrictive covenants, beginning on January 1, 2016, and for a period of ten years thereafter Mr. Atiyeh and his affiliates would receive $200,000.00 of advertising time per year, credited by LVL on a space available basis, to advertise their businesses on LVL's digital network. Agreement at § 7.3, Bates #676–77.

27.     Mrs. Atiyeh has an ownership interest and manages affiliates of Mr. Atiyeh that were subject to the $200,000.00 annual advertising credit provided under the Agreement, including the Manors of the Valley personal care facilities, consisting of Whitehall Manor, Saucon Valley Manor, Bethlehem Manor, and Parkland Manor, for which Mr. Atiyeh states "she's the legal entity

of the Manors" and "I'm a shareholder" and "a part of the trust" that owns the Manors. Mrs. Atiyeh

Dep. at 12:25–14:3; Mr. Atiyeh Dep. at 18:15–19:9.

28.     Mrs. Atiyeh benefited in part from the Agreement's advertising credit as the

Manors of the Valley personal care facilities, which Mrs. Atiyeh manages, have used the

advertising credit for years after the Agreement including during the course of this litigation. *See*

Pl.'s Mot. to Suppl. the R. for Pl.'s Renewed Mot. for Prelim. Inj. and Decl. J., Ex. A, Doc. No.

74-1; Aff. of Lois Arciszewski, Doc. No. 79.

29.     Mr. Atiyeh and Valley agreed that

> in the event of [their] actual or threatened breach of any one or more of the
> Restrictive Covenants contained in . . . <u>Article VII</u>, [LVL], in addition to all other
> rights and remedies at law and in equity, shall be entitled to (and [Mr. Atiyeh and
> Valley] consent[] to) a temporary restraining order and temporary and permanent
> injunctions entered by any court of competent jurisdiction enforcing the Restrictive
> Covenants contained in . . . <u>Article VII</u> against [Mr. Atiyeh and Valley] and
> restraining and enjoining [Mr. Atiyeh and Valley] from breaching any one or more
> the Restrictive Covenants, and to recover from [Mr. Atiyeh and Valley] all of
> [LVL's] reasonable attorney's fees and costs incurred in obtaining such remedies.

Agreement at § 7.4, Bates #677.

30.     Mr. Atiyeh and Valley further agreed that the damages that would result should

they violate the restrictive covenants are or may be "uncertain, speculative, and difficult to

ascertain," and accordingly agreed that if they commit

> a willful and/or intentional breach of any Restrictive Covenant (or other provision
> of <u>Article VII</u>), in whole or in part, and the same is not cured within sixty (60) days'
> written notice from [LVL, LVL] shall be entitled [in addition to the additional rights
> and remedies in Section 7.4], to recover double damages from [Mr. Atiyeh and
> Valley] as well as all actual attorney's fees and costs[.]

Agreement at § 7.5, Bates #677–78.

31.     Mr. Atiyeh and Valley also agreed they were "knowingly and voluntarily forever

and irrevocably, waiv[ing] any and all affirmative claims . . . and/or defenses . . . to the applicability

15

and/or enforceability of the restrictive covenants and other provisions contained in . . . <u>Article VII</u>," including, but not limited to, "lack of, or inadequacy of, consideration; unconscionability; invalidity, unenforceability; and/or unreasonableness of the duration, scope, geographic range, or other restrictions, obligations, or remedies stated in any of the restrictive covenants or other provisions of. . . Article VII;" as set forth in paragraph 7.6 of the Agreement. Agreement at § 7.6, Bates #678.

32.     The Agreement, including the restrictive covenants, waiver, and remedies provisions of Article VII, were negotiated at arms-length, and were knowingly and voluntarily agreed to by Mr. Atiyeh and Valley with the advice of their counsel. Compl. at ¶ 30; Mr. Atiyeh and Valley's Answer at ¶ 30.

33.     Mr. Atiyeh and Valley signed the Agreement with LVL, as evidenced by the signature page. Agreement at Bates #691;[1] *see also* Compl. at ¶ 31; Mr. Atiyeh and Valley's Answer at ¶ 31.

34.     Mr. Atiyeh testified that he understood that the Article VII restrictive covenants in the Agreement were promises he made, in part not to compete with LVL directly or indirectly, when he signed the Agreement. Nov. 21, 2019 Tr. at 132:6–12, 132:25–133:10.

35.     Mr. Atiyeh and Valley executed an Addendum to the Agreement in October 2016, which reaffirmed the parties' agreement to, and obligations under, the restrictive covenants in Article VII of the original Agreement.  Hearing Ex. P-13, Addendum to Asset Purchase Agreement at ¶ 2, Bates #731, Nov. 21, 2019 Tr. at 156:3–12, 159:13–23.

36.     Mr. Atiyeh testified that he used part of the $15,000,000 purchase money LVL paid him pursuant to the Agreement to pay the Internal Revenue Service (IRS) the amount of

---

[1] The signature page follows page 33 of the agreement. *See* Doc. No. 3-1.

$3,000,000.00, and invested some of the other money into real estate development. Nov. 21, 2019 Tr. at 109:10–110:8.

37.     Mr. Atiyeh and Valley were allowed to retain certain billboards and/or maintain outdoor advertising for the sole purpose of advertising Mr. Atiyeh's existing businesses, but not for use by other parties or advertisers, under the terms of the Agreement. Agreement at §§ 5.20, 5.22, 7.1(a)-(d), Bates #672–73, 675–76; *see also* Compl. at ¶ 34; Mr. Atiyeh and Valley's Answer at ¶ 34.

38.     The Agreement also expressly references the parties' intentions with respect to the Atiyeh family's ownership interests of an outdoor advertising business thereafter, as Mr. Atiyeh and Valley agreed that

> nothing in this <u>Section 7.1</u> shall be deemed to prevent [Mr.] Atiyeh or any member of his family from purchasing or owning, directly or beneficially, <u>as a passive investment</u>, less than ten (10%) of any class of the publicly traded securities of any corporation regardless of whether such corporation is involved in the outdoor advertising industry.

Agreement at § 7.1(a), Bates #675.

39.     Under the Agreement, Mr. Atiyeh and Valley are not allowed to own billboards on any after-acquired properties. *See* Agreement at § 7.1(c) ("[Mr.] Atiyeh shall not own such signage"), Bates #675–76.

### C.     The Billboards at Issue

40.     Following the execution of the Agreement but prior to June 1, 2019, Mr. Atiyeh and Valley owned Manor Signs, LLC, which in turn is alleged to be the sole member of certain subsidiaries (ManorSigns1, ManorSigns2, ManorSigns3, ManorSigns4, ManorSigns5, and ManorSigns6), which purportedly owns and controls the eleven billboards that are the subject of the pending complaint in this matter. Mrs. Atiyeh Interrog. Answers at #2 and #5.

41.     The eleven billboards include billboard structures located at the following locations:

      a.      574 S. Main Street, Nazareth, PA;

      b.      3667 Route 378, Lower Saucon Township, PA;

      c.      1030 N. West End Blvd, Richland Township, PA;

      d.      2387 Hanover Avenue, Allentown, PA;

      e.      540 Union Blvd, Allentown, PA;

      f.      1384 S. 5th Street, Allentown, PA;

      g.      Route 33, Wind Gap, PA;

      h.      725 Berger Road, Williams Township, PA;

      i.      225 Sumner Avenue, Allentown, PA;

      j.      1741 Trexlertown Road, Lower Macungie, PA;

      k.      202 N. 3rd Street, Allentown, PA.

Mrs. Atiyeh Interrog. Answers at #1 and #2; Hr'g Ex. P-14, Sale, Transfer and Assignment Agreement, Bates #10.A.

42.     Of these eleven billboards, Mr. Atiyeh retained only the one located at 3667 Route 378, Lower Saucon Township, PA, at the time of the Agreement. Nov. 21, 2019 Tr. at 127:20–128:3.

43.     LVL sold four of the eleven billboards (located at 540 Union Blvd, Allentown, PA; 225 Sumner Avenue, Allentown, PA; 1741 Trexlertown Road, Lower Macungie, PA; and 202 N. 3rd Street, Allentown, PA) back to Mr. Atiyeh via the Addendum to Agreement in October 2016. Hr'g Ex. P-13, Addendum to Asset Purchase Agreement; Nov. 21, 2019 Tr. at 127:3–130:10, 156:3–12.

44.     Mr. Atiyeh owned and built the remaining five billboards (located at 2387 Hanover Avenue, Allentown, PA; 1384 S. 5th Street, Allentown, PA; 1030 North West End Boulevard, Richland, PA; Route 33 at Male Road, Wind Gap, PA; and 574 South Main Street, Nazareth, PA (referred to as 574 South Street in Nazareth by Mr. Atiyeh at his deposition)) on land he acquired after executing the Agreement, in violation of section 7.1(c) of the Agreement. Nov. 21, 2019 Tr. at 127:3–130:10; *see* Agreement at § 7.1(c) ("Atiyeh shall not own such signage"), Bates #675– 76.

### D.      Mr. Atiyeh's Initial Attempts to Lease or Sell the Billboards

45.     Mr. Atiyeh admittedly attempted to lease the billboards that he built after the Agreement on after-acquired lands to third-parties such as WFMZ that could "do whatever they wanted to do with [the signs]." Mr. Atiyeh Dep. at 89:5–92:4. This was despite Mr. Atiyeh's agreement in section 7.1 of the Agreement to use his billboards only for his own use or for his affiliate's businesses. Agreement at § 7.1, Bates #675.

46.     Lois Arciszewski ("Ms. Arciszewski") has worked for Adams for 22 years and her primary responsibility is to maintain Adams' existing billboard locations and lease agreements, in addition to developing new billboard sites. Nov. 21, 2019 Tr. at 222:12–23.

47.     Following the execution of the Agreement, Mr. Atiyeh would on occasion contact Ms. Arciszewski to ask her opinion on whether certain types of advertising on the billboards he retained or built after the Agreement would comply with the restrictive covenants. Nov. 21, 2019 Tr. at 225:11–226:10. If she was unsure in borderline cases, she would discuss it with Adams' Vice President and General Counsel, Richard Zecchino ("Attorney Zecchino"), who had the authority and decision-making power on those issues. *Id.* at 226:11–227:1.

19

48.     In late 2018 and early 2019, Mr. Atiyeh initiated discussions with Ms. Arciszewski, in which he offered to sell or lease additional billboards to Adams, but these discussions fell through. Nov. 21, 2019 Tr. at 227:8–228:16.

### E.     The Sale of the Billboards from Mr. Atiyeh to Mrs. Atiyeh

49.     Mr. Atiyeh approached his wife in or around the beginning of March 2019 and proposed the idea of putting her into the outdoor advertising business. Mrs. Atiyeh Dep. at 33:22–34:14; Nov. 19, 2019 Tr. at 106:16–107:1.

50.     Mr. Atiyeh and Valley first proposed a lease arrangement whereby Mr. Atiyeh would lease the billboards to Flash Point Advertising, LLC. This caused a notice of right of first refusal to be sent to LVL, in which the identity of the offeror in the proposed lease arrangement was redacted to conceal the identity of Mrs. Atiyeh and/or Flash Point Advertising, LLC. Nov. 21, 2019 Tr. at 19:11–20:19.

51.     After receiving the notice of the right of first refusal for the lease offer, LVL responded to Mr. Atiyeh that the proposed lease arrangement would violate the restrictive covenants of the Agreement because he would be engaging in the business of outdoor advertising by leasing billboards. Nov. 21, 2019 Tr. at 19:11–21:22.

52.     After receiving LVL's response to the right of first refusal for the lease offer, Mr. Atiyeh decided to abandon his plan to lease the billboards, as he did not want to risk getting sued, and decided he would try to sell the billboards instead. Nov. 21, 2019 Tr. at 19:11–21:22.

53.     Mr. Atiyeh then proposed to sell his wife the billboards for $6,000,000. Nov. 19, 2019 Tr. at 65:8–11, 108:19–22, and 109:9–10; Nov. 21, 2019 Tr. at 19:11–21:25.

54.     The price was never negotiated, as neither Mr. or Mrs. Atiyeh suggested a number greater or less than $6,000,000.00. Mrs. Atiyeh Dep. at 38:15–23; Nov. 19, 2019 Tr. at 110:5–7.

55.     Ms. Atiyeh testified that her intention in the transaction was that she would use the billboards to engage in the business of outdoor advertising. Nov. 19, 2019 Tr. at 100:13–18, 109:11–24, and 127:2–8.

56.     Mr. Atiyeh knew at the time the sale was contemplated that Mrs. Atiyeh had formed Flash Point Advertising, LLC. Nov. 21, 2019 Tr. at 119:15–18.

57.     Mr. Atiyeh knew at the time the sale was contemplated that his wife planned to market the billboards to third parties to sell outdoor advertising. Nov. 21, 2019 Tr. at 122:10–25.

58.     Mrs. Atiyeh testified that it was her express intention to undersell LVL in the outdoor advertising business: "I looked at what I knew Adams and Lamar and others were charging, and I knew that if I under-sold them, because I didn't have as big of a network--network of boards, I could get the thousand dollars." Nov. 19, 2019 Tr. at 109:11–24, 128:15–23.

59.     Mr. and Mrs. Atiyeh discussed the concept of selling advertising on billboards, and this is how they came to an agreement of sale. Mrs. Atiyeh Dep. at 31:6–15.

60.     Mrs. Atiyeh testified that she is sure her husband provided her with a copy of the Agreement before she bought the subject billboards from him and admitted she "may have reviewed it" but she didn't "100 percent recall." Mrs. Atiyeh Dep. at p.88:14–89:13.

61.     Mrs. Atiyeh read and reviewed the restrictive covenants in the Agreement before buying the subject billboards, and she was familiar with the terms contained therein. Mrs. Atiyeh Dep. at 90:10–20, 94:20–25; Nov. 19, 2019 Tr. at 126:20–127:1, 130:18–131:1.

62.      Mrs. Atiyeh further confirmed that she read and reviewed section 7.4 of the Agreement, entitled "injunctive relief," before entering into the transaction with her husband, and that she fully understood that the clause provided for relief in the form of an injunction in the event of breach of the restrictive covenants. Nov. 19, 2019 Tr. at 132:11–134:16.

21

63.     Mrs. Atiyeh further confirmed that, with full understanding of what section 7.4 of the Agreement meant, she voluntarily decided to proceed with the transaction with her husband. Nov. 19, 2019 Tr. at 134:2–16.

64.     Over the course of the transaction, Mrs. Atiyeh was not represented by counsel, did not consult with an attorney about acquiring the billboards or the terms of the transaction, and did not review either the Note or the Sale, Transfer and Assignment Agreement with an attorney. Mr. Atiyeh Dep. at 76:11–16; Nov. 19, 2019 Tr. at 107: 7–108:18.

65.     Mr. Atiyeh was represented by counsel, Joel B. Wiener, Esq. ("Attorney Wiener"). Mr. Atiyeh Dep. at 76:11–16.

66.     Attorney Weiner sent a copy of the restrictive covenants to Mrs. Atiyeh in the interests of full disclosure, and she testified that she had full knowledge of the Agreement including the restrictive covenants, before she purchased the billboards from Mr. Atiyeh. Mrs. Atiyeh Dep. at 92:3–93:25; Nov. 19, 2019 Tr. at 131:16–20.

67.     Attorney Wiener sent an April 30, 2019 notice of right of first refusal on behalf of Mr. Atiyeh and Valley to Adams, in which the identity of the person(s) making the alleged purchase offer was concealed, redacted, and undisclosed. Hr'g Ex. P-37, Notice of Right of First Refusal – redacted original; Nov. 21, 2019 Tr. at 19:18–23, 74:10–75:8, and 165:15–20.

68.     The second page of the notice of right of first refusal is a document entitled "Confirmation of Your Offer of Purchase", that was executed on Digiview Outdoor, LLC letterhead by Mr. Atiyeh as President of Digiview Outdoor, LLC, which he described as "one of our companies." Hearing Ex. P-37, Notice of Right of First Refusal – redacted original; Nov. 21, 2019 Tr. at 168:15–20.

69.     Digiview Outdoor, LLC was not involved in the ultimate transaction between Mr. and Mrs. Atiyeh, whereby she became the sole member of Manor Signs, LLC. Nov. 21, 2019 Tr. at 168:21–169:7; Flashpoint Defs.' Answer at ¶ 40; Hr'g Ex. P-14, Sale, Transfer and Assignment Agreement, Bates ##0009-0010.A.

70.     The "Confirmation of Your Offer of Purchase" concealed the identity of the addressee of the confirmation letter.  Hr'g Ex. P-37, Notice of Right of First Refusal – redacted original.

71.     An unredacted copy of the "Confirmation of Your Offer of Purchase," shows, and the defendants have so stipulated, that the addressee of the confirmation letter was "Flash Point Advertising, LLC, 4260 Nazareth Pike, Bethlehem, PA 18020," and the individual confirming the terms of the offer on behalf of the Buyer was signed as "Priya Atiyeh, Manager, For Flashpoint LLC, Buyer." Hr'g Ex. P-38, Notice of Right of First Refusal – unredacted; Nov. 21, 2019 Tr. at 181:14–182:19, 183:1–9.

72.     Flash Point Advertising, LLC and Flashpoint LLC were not involved in the ultimate transaction between Mr. and Mrs. Atiyeh, whereby she became the sole member of Manor Signs, LLC. Flashpoint Defs.' Answer at ¶ 40; Hr'g Ex. P-14, Sale, Transfer and Assignment Agreement, Bates ##0009-0010.A; Nov. 19, 2019 Tr. at 148:20–25.

73.     At the time of the April 30, 2019 notice of right of first refusal, Mr. Atiyeh did not mention in any conversation with Ms. Arciszewski that his wife was going to be the one attempting to buy the billboards or billboard business from him. Nov. 21, 2019 Tr. at 229:6–12. LVL had no indication that any of the Atiyeh family was going to be involved with using the billboards for outdoor advertising of third parties. Nov. 21, 2019 Tr. at 229:13–17.

74.     On June 1, 2019, Mr. Atiyeh and Valley executed a Sale, Transfer and Assignment Agreement with Mrs. Atiyeh purportedly selling all ownership and membership rights and interests in Manor Signs LLC and the billboards owned by it and/or its subsidiaries, to Mrs. Atiyeh. Hr'g Ex. P-14, Sale, Transfer and Assignment Agreement, Bates ##0009-0010.A; Nov. 19, 2019 Tr. at 148:20–25.

75.     Mrs. Atiyeh became the sole member of Manor Signs, LLC on June 1, 2019. Mrs. Atiyeh Interrog. Answers at #2 and #5; Hr'g Ex. P-14, Sale, Transfer and Assignment Agreement, Bates ##0009-0010.A.

76.     Shortly thereafter, Mr. Atiyeh and Valley also executed a note with Mrs. Atiyeh providing seller financing for the claimed purchase of Manor Signs LLC and its billboards by Mrs. Atiyeh in the amount of $6,000,000 payable to Mr. Atiyeh. Hr'g Ex. P-15, Promissory Note dated June 6, 2019; Nov. 19, 2019 Tr. at 139:20–141:1.

77.     Mrs. Atiyeh understood that she was obligated to make the first payment under the note on July 1, 2019, and to continue making regular payments thereafter on the first of each month. Hr'g Ex. P-15, Promissory Note dated June 6, 2019; Nov. 19, 2019 Tr. at 142:1–17.

78.     Mr. and Mrs. Atiyeh admit that at the time of the transaction, they did not exchange any money. Mrs. Atiyeh Dep. at 67:12–14; Mr. Atiyeh Dep. at 46:14–16.

79.     Mrs. Atiyeh admits that she did not make the July payment on the Note. Mr. Atiyeh Dep. at 67:15–17.

80.     In fact, Mrs. Atiyeh has not made any payment to Mr. Atiyeh or Valley for the purchase of Manor Signs, LLC and its billboards.[2] Mrs. Atiyeh Dep. at 67:18–25; Mr. Atiyeh Dep. at 46:14–16, 69:17–22; Nov. 19, 2019 Tr. at 143:7–19.

---

[2] The Flashpoint Defendants also stipulated to this fact.

81.     Mr. Atiyeh testified that he was aware and understood that he could be found in violation of the restrictive covenants if he gifted the billboards to his wife because "then I would be putting her in the business if I had given her the company or – but, you know," such that giving her the billboards was something he understood he was not allowed to do under the restrictive covenants. Nov. 21, 2019 Tr. at 17:4–10, 86:25–87:6.

82.     Mrs. Atiyeh was not required to provide any kind of collateral for the $6,000,000 that was being owner-financed by her husband and confirmed by the promissory note, and the note is unsecured as there are no UCC filings taking a security interest in the structures. Mrs. Atiyeh Dep. at 71:16–20; Mr. Atiyeh Dep. at 49:15–25.

83.     Mr. Atiyeh has not charged any interest or any kind of late fees to Mrs. Atiyeh for failing to pay, and he has not taken any action to collect on the note despite the fact that the promissory note calls for interest to accumulate. Mr. Atiyeh Dep. at 46:14–25, 49:2–4; Hr'g Ex. P-15, Promissory Note dated June 6, 2019.

84.     Before buying the signs, Mrs. Atiyeh testified that she did not look at the permits, she did not look at any zoning approvals given by the municipalities where the billboards are located, and she did not verify whether the permits were actually in the name of Manor Signs, LLC. Mrs. Atiyeh Dep. at 57:3–10, 58:2–19.

85.     Mrs. Atiyeh testified that she had no idea if anybody on her behalf contacted the municipalities where the billboards are located to inquire whether permits could be transferred, nor whether her business ever actually got permits put in its name. Mrs. Atiyeh Dep. at 58:8–19.

86.     Mrs. Atiyeh was unaware of anyone having transferred either the Pennsylvania Department of Transportation ("PennDOT") permit for the billboard located on Berger Road in Williams Township that was held in the name of Berger Road Development, LP, as late as August

14, 2018, or the zoning use approval obtained for the sign's use from Williams Township, into the name of the company she purchased in the transaction, Manor Signs, LLC, at any point. Nov. 19, 2019 Tr. at 177:5–179:15, 182:23–184:16.

87.    Mrs. Atiyeh could not state whether Manor Signs, LLC has any ownership interest in the company, Pennsylvania Venture Capital, Inc., which holds the zoning permit for the billboard at 2327 Hanover Avenue in Allentown, Pennsylvania, which she believes is one of her signs. Nov. 19, 2019 Tr. at 189:1–190:10.

88.    Mrs. Atiyeh also could not clarify the relationship between Deed Holding Company, which holds the permit for the billboard on Route 33 in Wind Gap, and Manor Signs, LLC. Nov. 19, 2019 Tr. at 191:23–192:11.

89.    Mr. Atiyeh confirmed that he did not execute any documents assigning to his wife the permits for the signs he sold to her as part of the Manor Signs LLC transaction, and he had no idea whether the permits for the signs were even in the name of the company. Mr. Atiyeh Dep. at 25:16–26:6.

90.    Mrs. Atiyeh was unable to state the addresses of the locations of the billboards she purchased pursuant to the transaction, and she was unable to recall the streets on which some were located or even the municipalities in which they are situated. Mrs. Atiyeh Dep. at 41:16–47:13.

91.    Mrs. Atiyeh does not know whom the listed payee is on the utility bills for the billboards, and she could not confirm whether the payee is Manor Signs, LLC without going back and checking the bills. Nov. 19, 2019 Tr. at 196:10–197:18.

### F.    The Pre-existing Loan Collateralized by the Billboards

92.    Mr. Atiyeh personally guaranteed a pre-existing, outstanding loan owed by Manor Signs, LLC and the entities owned by it, totaling $1,144,809. Nov. 19, 2019 Tr. at 59:5–11, 141:2–

18, 149:5–150:1; Nov. 21, 2019 Tr. at 198:9–199:1. The loan existed at the time of the transaction

with Mrs. Atiyeh, and she was aware of the loan, and that Mr. Atiyeh had agreed in the promissory

note and the Sale, Transfer and Assignment Agreement that he would remain personally obligated

to pay on the loan, either directly on behalf of Manor Signs, LLC, or out of the payments due by

Mrs. Atiyeh as part of the sale. Nov. 19, 2019 Tr. at 141:2–18, 149:5–150:1; Hr'g Ex. P-15,

Promissory Note dated June 6, 2019; Hr'g Ex. P-14, Sale, Transfer and Assignment Agreement,

Bates ##0009-0010.A; Nov. 21, 2019 Tr. at 198:9–199:1.

93.     The billboards acquired by Mrs. Atiyeh as part of the transaction with Mr. Atiyeh

serve as collateral for the pre-existing loan of which her husband is obligated to repay. Nov. 19,

2019 Tr. at 151:1–4; Nov. 21, 2019 Tr. at 8:1–25.

94.     Mr. Atiyeh testified that he has personally paid the bank loans for the subject

billboard companies he does not own anymore, Manor Signs, LLC and its subsidiaries, in the

amount of approximately $14,000 every month since June 2019, despite having not received any

payments from his wife. Nov. 21, 2019 Tr. at 8:1–25, 199:2–200:18.

95.     Mrs. Atiyeh has not made any payment toward the outstanding $1,444,809 "pre-

existing loan" obligation for Manor Signs, LLC. Nov. 19, 2019 Tr. at 148:1–3.

### G.      Flash Point Advertising, LLC

96.     Flash Point Advertising, LLC does business on various marketing materials and

Mrs. Atiyeh formed it to market the sale of third-party advertising on the billboards she acquired.

Mrs. Atiyeh Dep. at 25:5–12; Hr'g Ex. P-35, Flashpoint Billboard Media Kit – original; Hr'g Ex.

P-75, Flashpoint Billboard Media Kit – updated / current; Nov. 19, 2019 Tr. at 170:11–171:4.

97.     There is no evidence of a lease or easement agreement between Manor Signs, LLC

and Flash Point Advertising, LLC.

98.     Mr. Atiyeh, who either owns the office building at which Flash Point Advertising, LLC has its registered office or owns the company that is the general partner of the owner of the building, testified that neither Flash Point Advertising, LLC nor Mrs. Atiyeh have made any lease payments for the Flash Point office. Mr. Atiyeh Dep. at 69:5–16.

99.     Neither Defendant Flash Point Advertising, LLC nor Mrs. Atiyeh have actually entered into any written lease for the office space, although Mrs. Atiyeh maintains there was a verbal agreement. Mrs. Atiyeh Dep. at 76:20–77:14; Mr. Atiyeh Dep. at 69:14–16.

100.    In contrast, Mr. Atiyeh testified that with respect to the Manors assisted living facilities operated by his wife on land he or his real estate entities own and lease, rent is always charged. Nov. 21, 2019 Tr. at 102:8–103:7.

101.    When asked to describe the Flash Point office space, Mrs. Atiyeh could not describe it, had no idea how many rooms it had, and confessed that she does not actually use the Flash Point office, stating that she does not go there much and instead works out of her phone, her car, her bedroom, and at her office at the Manors (the businesses she runs at her husband's properties). Mrs. Atiyeh Dep. at 74:24–76:7.

102.    Mr. Atiyeh's cell phone number appears on the same sign immediately next to the word "Flashpoint." Hr'g Ex. P-39, Photograph of Flashpoint Office Sign; Nov. 19, 2019 Tr. at 119:12–23.

### H.     The Selling of Third-Party Advertisements on the Billboards

103.    Priya Atiyeh has actively engaged in soliciting purchasers of outdoor advertising using the billboard inventory of Manor Signs, LLC and/or its subsidiaries since September 21, 2019. Mrs. Atiyeh Interrog. Answers at #8.

104.    Priya Atiyeh has discussed, offered, solicited, or negotiated the lease of advertising on the subject billboards with at least ten advertisers in addition to engaging in discussions for advertising with various other prospective customers. Mrs. Atiyeh Interrog. Answers at #9.

105.    Mrs. Atiyeh stated that if the court does not enter an injunction she intends to secure more outdoor advertisers on the subject billboards, and she continues actively marketing the billboards while this litigation is pending. Nov. 19, 2019 Tr. at 221:7–223:25.

106.    Mr. Atiyeh testified, "there's $3,000 a month of advertising we're doing right now." Nov. 19, 2019 Tr. at 227:11–20.

107.    Currently, there are five advertisers on the subject boards, including deals with "Frank at Gilboy," "Jeff Baskin" a Chevy car dealer, "Mikayla from Agency P" on behalf of a car dealer, and "Dr. Mark Moran." Mrs. Atiyeh Dep. at 50:2–55:22; Compl. at ¶ 50; Flashpoint Defs.' Answer at ¶ 50 (admitted in relevant part).

108.    Mrs. Atiyeh, Priya Atiyeh, and the Flashpoint entities have engaged in the outdoor advertising business by advertising for rent the billboards they acquired from Mr. Atiyeh and Valley. Compl. at ¶¶ 44, 46; Flashpoint Defs.' Answer at ¶¶ 44, 46 (admitted in relevant part); Mrs. Atiyeh Interrog. Answers at #8 and #9.

109.    Mrs. Atiyeh, Priya Atiyeh, and/or Flash Point Advertising, LLC have admittedly discussed, offered, solicited, or negotiated the lease of advertising space on the subject billboards with 23 distinct clients/businesses. Hr'g Ex. P-11, Interrog. Answers of Def. Priya Atiyeh at #5; Mrs. Atiyeh Interrog. Answers at #11.

110.    Mrs. Atiyeh and Priya Atiyeh, using the trade names "Flashpoint" and "Flashpoint1," have created a website (flashpoint1.com) and a media kit in which they advertise for rent digital billboards and/or digital outdoor advertising in "seven different locations in some

of the highest traffic locations around the Lehigh Valley." Hr'g Ex. P-35, Flashpoint Billboard Media Kit – original; Hr'g Ex. P-75, Flashpoint Billboard Media Kit – updated / current; Compl. at ¶ 47; Flashpoint Defs.' Answer at ¶ 47 (admitted in relevant part); Nov. 19, 2019 Tr. at 222:2–223:4.

111.    All persons or companies with whom Mrs. Atiyeh, Priya Atiyeh, and the Flashpoint entities have discussed, offered, solicited, or negotiated the lease of advertising space of the subject billboards are located within the Lehigh Valley, in either Lehigh or Northampton Counties, Pennsylvania. Mrs. Atiyeh Interrog. Answers at #11.

112.    Mrs. Atiyeh continues to actively advertise, market, and solicit the subject billboards for rent, and confirmed that she is still actively trying to generate outdoor advertising business. Compl. at ¶ 53; Flashpoint Defs.' Answer at ¶53 (admitted in relevant part); Nov. 19, 2019 Tr. at 220:13–15, 221:7–223:16; Nov. 21, 2019 Tr. at 243:1–244:12; Hr'g Ex. P-81, Photograph of CAT Country Radio Station on Route 33, Wind Gap, PA Billboard.

## I.    LVL Learns of Mrs. Atiyeh's Involvement

113.    On July 1, 2019, Ms. Arciszewski sent Mr. Atiyeh a text message in which she related that "people took photos of your 33 digital that says- advertise here" and questioned why the billboard was being advertised for third-party outdoor advertising. Hr'g Ex. P-42, Text Message Dated July 1, 2019 ("July 1, 2019 Text"); Nov. 21, 2019 Tr. at 189:11–190:6, 230:13–18. In response, Mr. Atiyeh stated that he sold it, and confirmed that he sold all of his billboard structures to his wife. July 1, 2019 Text; Nov. 21, 2019 Tr. at 190:6–16, 230:18–24.

114.    Later that day, Attorney Zecchino sent an email which Ms. Arciszewski forwarded to Mr. Atiyeh, in which Attorney Zecchino raised concern that the transaction between Mr. Atiyeh and his wife violated the restrictive covenants in the Agreement, to which Mr. Atiyeh stated, "I

sold the company tell richard [sic] to fuck off." Hr'g Ex. P-66, Email Chain Dated July 1, 2019;

Nov. 21, 2019 Tr. at 190:25–193:24.

115.    Mr. Atiyeh nevertheless continued to offer to sell or lease the billboards to Adams

or LVL despite claiming he had already sold them to his wife. Nov. 21, 2019 Tr. at 230:25–p.232

line 3 (objection overruled).

### III.    DISCUSSION

#### A.    <u>Motion for a Preliminary Injunction</u>

##### 1.    **Standard – Motion for a Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Kos Pharm., Inc. v. Andrx Corp.*, 369

F.3d 700, 708 (3d Cir. 2004) ("Preliminary injunctive relief is an extraordinary remedy and should

be granted only in limited circumstances." (citation and internal quotation marks omitted)). A

district court should not grant a motion for preliminary injunctive relief unless the moving party

shows "(1) a likelihood of success on the merits; (2) that [the moving party] will suffer irreparable

harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater

harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc.*

369 F.3d at 708 (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)).

Additionally, to obtain a preliminary injunction, the moving party must establish its entitlement to

such relief by clear evidence on the merits of its claim. *See Winter*, 555 U.S. at 22 (explaining that

"a preliminary injunction . . . is . . . an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief").

Regarding the application of the four factors referenced above,

a movant for preliminary equitable relief must meet the threshold for the first two
"most critical" factors: it must demonstrate that it can win on the merits (which

requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief.  If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.  In assessing these factors, Judge Easterbrook's observation bears repeating: "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.  [*Hoosier Energy Rural Elec. Corp., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).]

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (internal footnotes omitted). Also, a party's failure to demonstrate a likelihood of success in the litigation **or** an irreparable injury "must necessarily result in the denial of a preliminary injunction." *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982). Nonetheless, and as indicated above, "there may be circumstances when the plaintiff satisfies the first two factors, but the balance of the equities and/or the public interest militate against granting a preliminary injunction." *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 75 (3d Cir. 2017) (citations omitted).

Generally, "[a] primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994); *see also University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Thus, "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno*, 40 F.3d at 647 (citation omitted).

## 2.      Likelihood of Success on the Merits

### a.      Breach of Contract Claim

This court finds that LVL has demonstrated a reasonable probability of success on the merits of its breach of contract claim for a violation of the restrictive covenants in the Agreement. "Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (internal citations omitted). If the terms of the agreement are clear, then the court does not look to extrinsic evidence in determining the meaning of an agreement. *Mace v. Atl. Refining Mktg. Corp.*, 785 A.2d 491, 496 (Pa. 2001) ("It is firmly settled that the intent of the parties to a written contract is contained in the writing itself. When the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents alone." (citations and internal quotation marks omitted)).

In the instant case, the Agreement is a valid and enforceable contract between LVL and Mr. Atiyeh and Valley, which sets forth each party's rights and responsibilities to each other. *See Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1194 (Pa. Super. 1987) (holding that contract is enforceable "when the parties reach mutual agreement, exchange consideration, and have outlined the terms of their bargain with sufficient clarity" (citation omitted)). It does not appear that any of the defendants challenge the existence or validity of the Agreement generally. Furthermore, because the court finds that the Agreement includes all necessary provisions, it is unambiguous. *See Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir. 1986) (explaining that contract is unambiguous if court can determine its meaning without any guide other than knowledge of simple facts on which, from nature of language in general, its meaning depends).

Therefore, because the court finds the existence of a valid contract, the question becomes whether there is a breach of a duty imposed by the contract.

Specifically, the question in this instant case is whether there is a breach of the covenant not to compete restrictions as laid out in the Agreement. Under Pennsylvania law, a non-compete covenant is enforceable if: (1) the covenant relates to either a contract for the sale of goodwill or other subject property; (2) the covenant is supported by adequate consideration; and (3) the application of the covenant is reasonably limited in both time and territory. *Piercing, Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 210 (Pa. Super. 1976). Courts must strictly construe non-compete covenants since they are "a partial restraint upon the free exercise of trade." *Maaco Franchising, Inc. v. Augustin*, Civ. A. No. 09-4548, 2010 WL 1644278, at *3 (E.D. Pa. Apr. 20, 2010) (quoting *Hayes v. Altman*, 266 A.2d 269, 271 (Pa. 1970)). The Flashpoint Defendants do not argue that the non-compete covenant is unenforceable generally, but rather, they maintain that it is unenforceable against them and that they did not violate the covenant not to compete. More specifically, they maintain that they were not parties to the Agreement and, therefore, are not bound by its terms.

The Flashpoint Defendants also argue that there is no violation of the covenant not to compete because "only Mr. Atiyeh is bound by the Agreement's restrictive covenants, not members of his family or their businesses." Mem. of Law of Defs., Nimita Kapoor Atiyeh, Priya Atiyeh, Flashpoint, Flashpoint1, and Flashpoint Advertising LLC, in Opp. to Pl.'s Renewed Mot. for Prelim. Inj. and Decl. J. ("Flashpoint Defs.' Mem.") at 3, Doc. No. 62. They maintain that this is the case because (1) the express terms of the restrictive covenants only apply to Mr. Atiyeh, (2) Mrs. Atiyeh is not a non-covenantor who benefited from the Agreement such that she is bound by its restrictive covenants, (3) Mr. and Mrs. Atiyeh did not act in concert to circumvent the Agreement's restrictive covenants, (4) Mr. Atiyeh's sale of Manor Signs, LLC to Mrs. Atiyeh was

a bona fide, arms-length transaction for value, and (5) Mrs. Atiyeh is not a successor to Mr. Atiyeh or Valley such that she is bound by the Agreement's restrictive covenant. Flashpoint Defs.' Mem. at 2–15. Mr. Atiyeh and Valley similarly argue that (1) no one other than Mr. Atiyeh and Valley are bound by the restrictive covenant and (2) Mr. Atiyeh did not violate the Agreement's restrictive covenants. Mem. of Law of Defs. Abraham Atiyeh and Valley Realty Holdings Limited in Opp. to Pl.'s Renewed Mot. for Prelim. Inj. and Decl. J. ("Mr. Atiyeh and Valley's Mem.") at 5–14, Doc. No. 65. The court finds these arguments unpersuasive given the largely undisputed facts of this case.

First, Mr. Atiyeh and Valley's sale of Manor Signs LLC to Mrs. Atiyeh was not a bona fide transaction. To qualify as a bona fide purchaser, Mrs. Atiyeh must have: (1) paid valuable consideration for the property she obtained from Mr. Atiyeh and Valley; (2) had no notice of any outstanding interests in the property; and (3) acted in good faith. *See Carnegie Nat. Gas Co. v. Braddock*, 597 A.2d 285, 288 (Pa. Commw. 1991) (defining bona fide purchaser). Here, there is no evidence that Mrs. Atiyeh actually paid valuable consideration for the property. On June 1, 2019, Mr. Atiyeh and Valley executed a Sale, Transfer and Assignment Agreement with Mrs. Atiyeh purportedly "selling" all ownership and membership rights and interests in Manor Signs, LLC and the subject billboards owned by it and/or its subsidiaries to her. Soon afterwards, Mr. Atiyeh and Valley also executed a Note with Mrs. Atiyeh providing seller financing for the claimed purchase of Manor Signs, LLC and its billboards in the amount of $6,000,000 payable to Mr. Atiyeh.

Despite there being a purchase price of $6,000,000, this was not a bona fide transaction as valuable consideration was never actually paid for the property at the time, or thereafter. As all the defendants admit, no money was exchanged at the time of the alleged sale. In addition, both Mr.

and Mrs. Atiyeh testified that Mrs. Atiyeh did not make the July payment that was due on the Note. In fact, Mrs. Atiyeh has not yet made any payment to Mr. Atiyeh and Valley relating to the transaction involving Manor Signs, LLC and its billboards. Furthermore, Mr. Atiyeh never requested that Mrs. Atiyeh provide any kind of collateral for the $6,000,000 is indicative of the fact that no real consideration was paid for the sale. Moreover, despite the fact that the Promissory Note calls for interest to accumulate, Mr. Atiyeh has also not charged any interest or any kind of late fees to Mrs. Atiyeh for failing to pay, and he has not taken any action to collect on the Note. Therefore, given the lack of consideration received by Mr. Atiyeh and Valley, the court cannot find that an arms-length transaction took place.

The court also has doubts over whether the various defendants acted with independent interests, as it is apparent from the record testimony that Mrs. Atiyeh knew that her husband was bound by certain restrictive covenants, as she had read the Agreement prior to the sale. As Mr. Atiyeh testified, he was also aware and understood that he could be found in violation of the restrictive covenants if he gifted the billboards to his wife because "then I would be putting her in the business if I had given her the company or – but, you know," indicating that he understood that giving his wife the billboards was something he could not do under the restrictive covenants. Nov. 21, 2019 Tr. at 17:4–10. However, this court finds that "selling" the company to his wife for no actual consideration, so that she could compete with LVL, also violated the terms of the restrictive covenants of the Agreement, as opposed to being a legitimate arms-length transaction. *See In re U.S. Med., Inc.*, 531 F.3d 1272, 1277 n.4 (10th Cir. 2008) (explaining that arms-length transaction is "[a] transaction in good faith in the ordinary course of business by parties with independent interests…. The standard under which unrelated parties, each acting in his or her own best interest,

would carry out a particular transaction" (alteration in original) (quoting Black's Law Dictionary 109 (6th ed. 1990))).[3]

Second, Mrs. Atiyeh acted in concert with Mr. Atiyeh to circumvent the Agreement's restrictive covenants. As Rule 65(d)(2) of the Federal Rules of Civil Procedure provides, a preliminary injunction may bind parties, their "officers, agents, servants, employees and attorneys," and all other persons "who are in active concert or participation" with the parties or their officers, agents, servants, employees, and attorneys. Fed. R. Civ. P. 65(d). Prior to the sale, Mr. and Mrs. Atiyeh admitted that they discussed the concept of selling advertising on the billboards at issue, and that this is how they came to an agreement of sale. The two also executed the Sale Agreement together, with counsel only representing Mr. Atiyeh at the time. The transaction itself was imbued with factors indicating that Mr. and Mrs. Atiyeh were acting together in concert, even excluding that they are married and maintain a personal relationship of close trust. Mr. Atiyeh is a professional billboard operator with more than 20 years of experience, while he describes his wife as having zero prior experience in outdoor advertising. Yet, Mrs. Atiyeh had no attorney when it came to this transaction involving an outdoor advertising business and did not seek any independent legal advice about it despite her lack of prior experience. Instead, Mrs. Atiyeh relied on her husband's counsel to make full disclosures with respect to the Sales Agreement and to provide her with copies of relevant documents.

Additionally, before buying the signs, Mrs. Atiyeh did not look at the permits for them, did not review any zoning approvals given by the municipalities where the billboards are located, and did not verify whether the permits were actually in the name of Manor Signs, LLC. Mr. Atiyeh

---

[3] The most recent version of Black's Dictionary defines an arm's-length transaction, as relevant to this case, as "[a] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." *Arm's-Length Transaction*, Black's Law Dictionary (11th ed. 2019).

also confirmed that he did not execute any documents assigning to his wife the permits for the signs he sold to her as part of the Manor Signs, LLC transaction. These facts strongly suggest that Mr. Atiyeh planned to remain involved with the billboards even after the transaction with his wife, as it appears that neither husband nor wife cared about ensuring that the actual use permits were in the name of Mrs. Atiyeh alone.

Moreover, Mrs. Atiyeh could not state whether Manor Signs, LLC, which is the business she bought from Mr. Atiyeh, even owns each of the billboards at issue, saying she does not recall. The fact that Mrs. Atiyeh cannot recall what she bought in this $6,000,000 transaction also suggests that transaction was not as genuine as the defendants claim. Taking all these facts together, the court finds that the parties were likely not acting independently from each other. Both Mr. and Mrs. Atiyeh admit that the first number thrown out by Mr. Atiyeh as a "purchase price" for this transaction was the number agreed upon, and that no attempt was made by Mrs. Atiyeh to bargain. To agree to a price without any negotiation is atypical of an arms-length business deal. Accordingly, all these facts are enough for the court to find that the parties were acting in concert with each other and violating the restrictive covenants.

Third, there is additional evidence supporting the conclusion that Mr. and Mrs. Atiyeh's transaction was not a genuine sale for bona fide consideration. Mr. Atiyeh agreed in the Promissory Note and the Sale, Transfer and Assignment Agreement that he would remain personally obligated to pay the preexisting, outstanding loans for Manor Signs, LLC, which totaled $1,144,809. Mrs. Atiyeh has not currently made any payment toward the outstanding $1,444,809.00 loan obligation for Manor Signs, LLC, despite now owning the company. Furthermore, she testified that she did not look into the loan documents or details for the over-one-million-dollar pre-existing, outstanding loans that Manor Signs, LLC had in existence prior to buying the company. Mr. Atiyeh

admits that he has personally paid the bank loans for Manor Signs, LLC and its subsidiaries, in the amount of approximately $14,000.00 every month since June 2019, despite having not received any payments from his wife, the new owner of the company. This suggests that Mr. Atiyeh has retained some interest in these billboard assets, which would be in direct violation of the restrictive covenants, as it is undisputed that these billboards are being used to advertise third-party businesses, as opposed to just the Atiyeh family's businesses. Significantly, it is also apparent from the record that the over $1.4 million in loans that Mr. Atiyeh holds are collateralized by the very billboards that he claims he is no longer involved with and are solely owned by his wife. Taken together, all these facts further suggest that this was not a genuine transaction between two educated business people, who just happened to be husband and wife, but rather that this was a transaction designed simply to circumvent the restrictive covenants to which Mr. Atiyeh and Valley had agreed.

Fourth, other facts surrounding Manor Signs, LLC's relationship with the Flashpoint entities, which are providing the marketing for the billboards, also cast doubts on the legitimacy of the operation. There is no written marketing agreement, lease agreement, or any other agreement between Manor Signs, LLC and Flash Point Advertising, LLC which allows Flash Point Advertising, LLC to market outdoor advertising on the eleven billboards owned in name by the former. Such evidence suggests that the defendants in this case treat these companies as little more than interchangeable shell companies. Furthermore, despite owning the office building at which Flash Point Advertising, LLC has its registered office, or owning the company that is the general partner of the owner of the building, and despite serving as the managing leasing agent for the office, Mr. Atiyeh admits that Flash Point Advertising LLC, Mrs. Atiyeh and Priya Atiyeh have not made any lease rent payments for the Flash Point office. Again, this suggests the illegitimacy

of the transaction, as does the fact that Mr. Atiyeh's cell phone number even appears on the same sign immediately next to the word "Flashpoint," despite the fact that he claims to not be involved with his wife's billboard business in any way.

Finally, Mrs. Atiyeh, as wife of Mr. Atiyeh, is a non-covenantor who benefitted from Mr. Atiyeh's contractual relationship with LVL under the Agreement. In Pennsylvania, "[i]t is well-established that a non-covenantor who benefits from the covenantor's relationship with a competing business must abide by the same restrictive covenant agreed to by the covenantor." *Tantopia Franchising Co., LLC v. West Coast Tans of PA, LLC*, 918 F. Supp. 2d 407, 416–17 (E.D. Pa. 2013) (citations omitted). This principle dates back to 1973, in the persuasive case of *Suburban Oil Service, Inc. v. Parker*, 63 Pa. D. & C.2d 91 (Luzerne Cty. Ct. Com. Pl. 1973), which involved a husband selling his fuel oil business to a competitor. As part of this sale, the husband also signed a covenant not to compete, which provided "that he would not, in any capacity whatsoever, engage directly or indirectly in the fuel oil business in Luzerne, Lackawanna, or Wyoming Counties for a period of seven years." *Id.* at 92. Under this covenant, the husband could also not knowingly assist any person to directly or indirectly acquire the accounts of the purchaser. *Id.* After the sale, the husband became an employee of the purchaser, for two and a half years, before he resigned. *Id.* Less than a week from the husband's resignation, the husband's wife set up a similar oil business to the one that her husband had just resigned from. *Id.* The court held that the wife was bound by the covenant not to compete and granted a preliminary injunction against both the husband and wife. *Id.* In doing so, the court held that

> where a husband is enjoined from establishing a second business after covenanting not to compete, a wife should not be allowed to obtain the benefit of the proceeds of said covenant and then, defiantly, in her name, establish a like business. This recalls the old adage "you can't have your cake and eat it too."

*Id.* at 93.

40

In the instant case, Mrs. Atiyeh benefitted from Mr. Atiyeh's contractual relationship with LVL under the Agreement, and therefore must abide by the same restrictions as her husband. Mrs. Atiyeh benefitted from the covenant in the form of a tax benefit, as Mr. Atiyeh used a portion of the $15,000,000 he received from the Agreement to pay down a tax obligation. Since Mr. and Mrs. Atiyeh file their taxes jointly, Mrs. Atiyeh directly benefitted from the consideration paid by LVL, in part for the restrictive covenants.

More significantly, Mrs. Atiyeh also benefits from the Agreement through an advertising credit for the businesses she co-owns with her husband. "As further and independent consideration for the Restrictive Covenants," LVL agreed "to allow a continued right of Atiyeh and his affiliates to advertise their respective businesses upon [LVL's] digital network" in the amount of $200,000.00 of "advertising time" per year, credited by LVL on a "space available basis," which includes advertising the Manors of the Valley personal care facilities on land owned by Mr. Atiyeh that he leases to businesses owned and operated by his wife. Agreement at § 7.3. Because Mrs. Atiyeh operates and serves as the president of the Atiyeh family businesses known as "The Manors of the Valley," consisting of Whitehall Manor, Saucon Valley Manor, Bethlehem Manor, and Parkland Manor, which are personal care assisted living facilities, and these facilities have taken advantage of the free advertising credit included in the Agreement, even during the course of this very litigation, Mrs. Atiyeh has and continues to directly benefit from the consideration of free advertising as included in the Agreement. She receives this benefit from the Agreement not because she is simply married to Mr. Atiyeh, but because she co-owns and operates businesses with him that benefit from the free advertising credit. Therefore, Mrs. Atiyeh and the rest of the Flashpoint Defendants can be considered non-covenantors who are bound by the restrictive covenants of the Agreement.

41

While all the defendants attempt to rely on the non-binding case of *Russell v. Mullis*, 479 So. 2d 727 (Ala. 1985), to prove that a transaction between husband and wife can be legitimate, *see, e.g.*, Flashpoint Defs. Mem. at 9–10, the court finds that this case is easily distinguishable. In *Russell*, an Alabama trial court granted an injunction to enforce a covenant not to compete against a husband, but denied a request for an injunction against his wife, who owned her own businesses which was alleged to have violated the husband's covenant not to compete. 479 So. 2d at 728, 729. On appeal to the Supreme Court of Alabama, the Court rejected the plaintiffs' argument that the trial court erred in denying their request to enjoin the wife. In rejecting the plaintiffs' contention, the Court explained:

> A person who has not executed or signed the contract or covenant is not bound by the stipulation against engaging in business, and he may not be enjoined from competing with the covenantee. He may, however, be restrained from engaging in the business in partnership with, or as an employee of, the covenantor or seller.

*Id.* at 729 (citations and internal quotation marks omitted). The Court then found that

> [t]here is substantial evidence to show that Dixieland is owned and operated solely by [Mrs.] Mullis. All of the licenses were issued in her name. She made the arrangements to borrow the additional money necessary to establish the business, and there was no co-signer on her loan. She negotiated with the companies from whom she purchased products. Her husband had not purchased goods for the store, nor had he aided his wife in keeping up with the inventory, or in marketing, or otherwise by working as an employee.

*Id.*

The instant case is readily distinguishable from *Russell*, as efforts were not made to ensure that the permits for the billboards were all issued solely to Mrs. Atiyeh, the way all licenses in *Russell* were issued solely to the wife, as Mrs. Atiyeh indicated she was unsure what entities owned the permits at the time of the transaction or even afterwards. Furthermore, while in *Russell* the wife made arrangements to borrow the additional money necessary to establish the business, in this case Mrs. Atiyeh borrowed the additional money to purchase the business from her husband

himself, and she has not made any payments on this loan since then. Moreover, while in *Russell* the Court found that the wife was truly running the competing business on her own, Mr. Atiyeh played a role in setting up his wife in the competing business as the two discussed her entering the outdoor advertising business prior to the transaction taking place between husband and wife. Therefore, *Russell* is not persuasive authority. The undisputed facts in the instant case lead to the conclusion that Mrs. Atiyeh and the Flashpoint Defendants can be bound by the restrictive covenants of the Agreement and these defendants, along with Mr. Atiyeh and Valley, have been violating these covenants. Thus, there is a breach of the duty imposed by the Agreement and the question next becomes whether there are resultant damages in order for LVL to have a valid breach of contract claim that is likely to succeed on the merits.

This court finds that there are resultant damages from the breach of the covenants not to compete. In the Agreement, Mr. Atiyeh and Valley agreed that LVL had valid, valuable, and important interests to protect via the restrictive covenants, including, but not limited to, its relationships with clients/customers/property owners and against unfair competition, and that the restrictive covenants were reasonable and necessary to protect those interests. *See* Agreement at § 7.1, Bates #675. By the defendants violating the duty not to compete, LVL suffers resulting damages as there is the possibility of permanent loss of customers to the competitor. This is the very reason LVL included the restrictive covenants in the Agreement in the first place. Therefore, as LVL has satisfied all three elements of a breach of contract claim, it has demonstrated a reasonable probability of success on the merits of its breach of contract claim.

      b.    <u>Intentional Interference with Performance of Contract by Third Person</u>

Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (quoting *Strickland v. Univ. of Scranton,* 700 A.2d 979, 985 (Pa. Super. 1997)). In this case, LVL brings an intentional interference with contract claim against the Flashpoint Defendants. Compl. at ¶¶ 73–81. LVL has satisfied the first element of the intentional interference with a contractual relation cause of action, as there exists a valid contractual relation between LVL and Mr. Atiyeh and Valley. The court must therefore turn to the second element, which is whether there exists purposeful action on the part of the Flashpoint defendants, specifically intended to harm the existing relation between LVL, Mr. Atiyeh, and Valley.

LVL alleges that the Flashpoint Defendants interfered with the contract between LVL, Mr. Atiyeh, and Valley by inducing or otherwise causing Mr. Atiyeh and Valley to not perform their contractual obligations under the Agreement's restrictive covenants. They maintain that the Flashpoint Defendants did this by

a.      Soliciting the "sale" by Defendants Abraham Atiyeh and/or Valley of billboards and/or outdoor advertising;

b.      Agreeing to "purchase" from Defendants Abraham Atiyeh and/or Valley of billboards and/or outdoor advertising;

c.      Soliciting and/or accepting assistance from Defendants Abraham Atiyeh and/or Valley with setting up, managing, or otherwise related outdoor advertising business;

d.      Soliciting and/or accepting advice from Defendants Abraham Atiyeh and/or Valley in connection with an outdoor advertising business;

e.      Soliciting and/or accepting services from Defendants Abraham Atiyeh and/or Valley in connection with an outdoor advertising business;

     f.     Otherwise inducing, causing, and/or joining with Defendants Abraham Atiyeh and/or Valley to aid, abet, agree, and/or assist them, directly or indirectly, with an outdoor advertising business.

Compl. at ¶ 75.

This court finds that the Flashpoint Defendants, at the very least, accepted assistance from Mr. Atiyeh when it came to setting up an outdoor advertising business, as Mrs. Atiyeh and Mr. Atiyeh and Valley executed a Sale, Transfer and Assignment Agreement in which Mrs. Atiyeh bought all ownership and membership rights and interests in Manor Signs, LLC and the subject billboards owned by it and/or its subsidiaries. However, as this court has previously discussed, this was not a bona fide arms-length transaction for value. Rather, it was likely just an attempt by Mr. Atiyeh and Valley to avoid the restrictive covenants they agreed to in the Agreement by instead setting up Mrs. Atiyeh in the outdoor advertising business. Therefore, LVL has satisfied the second element of the intentional interference with a contractual relation because Mrs. Atiyeh agreeing to participate in a "sale" simply to avoid the restrictive covenants that her husband agreed to is specifically designed to harm the existing relation between Mr. Atiyeh, Valley, and LVL by trying to avoid the restrictive covenants for which these parties freely negotiated.

Concerning the third element, there is no privilege or justification on the part of any of the defendants for attempting to circumvent the restrictive covenants. Se*e Educ. Impact, Inc. v. Danielson*, Civ. A. No. 14-937 (FLW)(LHG), 2015 WL 381332, at *18–19 (D.N.J. Jan. 28, 2015) ("The Amended Complaint asserts that Teachscape and DGLLC caused Danielson and OA to breach their contract with EI 'with knowledge of and intentional disregard for EI's rights as the exclusive licensee of the Framework for Teaching ... [and of] Danielson and OA's obligation under the non-compete clause.' Because, as noted above, the Amended Contract presents sufficient evidence to infer that DGLLC acted with the intent to interfere with EI's contract, this assertion is

sufficient to show a lack of privilege or justification." (alteration in original) (internal citation omitted)). While the defendants have argued that Mrs. Atiyeh is a separate entity from her husband and a competent businesswoman in her own right, and while this may indeed be the case, when it comes to this transaction, Mrs. Atiyeh was acting in concert with her husband as much of the evidence in the record indicates that the sale took place for no actual consideration, despite the $6,000,000 promissory note. Therefore, there is sufficient evidence in the record demonstrating that the Flashpoint Defendants acted with the intent to interfere with Mr. Atiyeh and Valley's contract with LVL, rather than to simply benefit their own interests.

Lastly, the court addresses the occasioning of actual legal damage as a result of the defendants' conduct. As previously discussed, this contractual interference results in LVL suffering damage as there is the possibility of permanent loss of customers to the unfair competitor. Accordingly, because all four elements of the contractual interference claim are likely met, the court finds that LVL is likely to succeed on the merits of its contractual interference claim against the Flashpoint Defendants.

c.    Conspiracy

To state a civil action for conspiracy under Pennsylvania law, a plaintiff must prove "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 660 (Pa. Super. 2000). "Additionally, 'absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.'" *Id.* (quoting *Pelagatti v. Cohen*, 536 A.2d 1337, 1342 (Pa. Super. 1987)). A plaintiff asserting a claim for civil conspiracy must therefore "plead or develop a[] separate underlying intentional or criminal act that can support

46

a civil conspiracy claim." *Goldstein v. Phillip Morris, Inc*., 854 A.2d 585, 590 (Pa. Super. 2004). In this case, LVL has pleaded the underlying intentional act of third-party contractual interference. Furthermore, "[p]roof of malice, *i.e.*, an intent to injure, is an essential part of a conspiracy cause of action; this unlawful intent must also be without justification." *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. 2003) (citing *Thompson Coal Co. v. Pike Coal Co*., 412 A.2d 466, 472 (Pa. 1979)).

Concerning the first element, for the reasons already explained, Mr. Atiyeh and Mrs. Atiyeh acted together with the common purpose of unlawfully getting around the restrictive covenants that Mr. Atiyeh and Valley agreed to in the Agreement. They did this lacking privilege or justification for this unlawful act. Therefore, the first element of a civil conspiracy claim is met.

With regards to the second element, an overt act was done in pursuing the common purpose of getting around the restrictive covenants—Mr. Atiyeh and Valley executed a Sale, Transfer and Assignment Agreement in which Mrs. Atiyeh "bought" all ownership and membership rights and interests in Manor Signs, LLC and the subject billboards owned by it and/or its subsidiaries. This is enough to meet the overt act requirement.

Furthermore, for reasons already explained in-depth, the actual legal damages requirement has also been met as LVL has suffered a loss of business as a result of the defendants' actions. The remaining question before the court is thus whether there is proof of malice on the part of the defendants.

As the court held in *Reading Radio, Inc. v. Fink*,

[m]alice is shown in this agreement because it was made between Appellants in reckless disregard of both Appellant Kline's duty of loyalty to WAGO and WAGO's contract rights with Fink and Ulrich at a time when WAGO's sales staff was short-handed. As shown above, the consequence of the loss of Fink and Ulrich was a precipitous drop in WAGO's sales performance, which corresponded to WAGO's decline in value.

833 A.2d at 213. In *Fink*, the defendants had also signed covenants-not-to-compete. *Id.* at 212–13. Similarly, in this case malice can be shown because there was a reckless disregard of LVL's contractual rights under the Agreement, as the court has already found that the transaction that Mr. and Mrs. Atiyeh entered into was largely for the purpose of wrongfully avoiding the restrictive covenants that bound Mr. Atiyeh and Valley. Therefore, malice may be proven in this case, and LVL has a reasonable likelihood of success on the merits with regards to its civil conspiracy claim.

### C.   Irreparable Harm

Concerning a showing of irreparable harm, "the plaintiff must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Thus, to support the granting of a request for a preliminary injunction, a plaintiff must demonstrate a "clear showing of immediate irreparable injury . . . or a presently existing actual threat; (an injunction) may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (internal citations and quotations omitted).

Further, if the threatened harm is compensable with money damages, a movant seeking preliminary injunctive relief has not demonstrated irreparable harm and the court should not issue a preliminary injunction. *See Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*, 847 F.2d 100, 102–03 (3d Cir. 1998) ("The availability of adequate monetary damages belies a claim of irreparable injury."); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief might be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). The Third Circuit has also

explained that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).

In this case, the Flashpoint Defendants argue that "LVL failed to meet its burden of establishing that it would suffer irreparable harm inasmuch as a money damage award would compensate LVL for any harm allegedly suffered in this matter." Flashpoint Defs.' Proposed Findings of Facts and Conclusions of Law ("Flashpoint Defs.' Findings and Conclusions") at ¶ 28, Doc. No. 63. Despite this argument, the Flashpoint Defendants do not offer any evidence that money damages would be sufficient.

The Flashpoint Defendants also maintain that "LVL had an opportunity to prevent any purported harm it suffered due to [Mr.] Atiyeh's sale of the disputed billboards—by purchasing the disputed billboards for $6 million pursuant to the RFR—but chose not to do so." *Id.* at ¶ 29. The court does not find this argument persuasive, especially given the fact that it does not appear that the $6 million offer was genuine, and because the right to first refusal in no way impacts the covenants not to compete as they pertain to Mr. Atiyeh, Valley, and those non-covenantors who benefited from the Agreement.

The right to first refusal does not mitigate damages when the covenants are still being violated. Instead, violations of covenants not to compete can result in the likelihood of loss of control of reputation, loss of trade, and loss of good will sufficient to warrant relief. *Tantopia Franchising Co.,* 918 F. Supp. 2d at 417. In addition, interfering with customer relationships satisfies the irreparable harm requirement for the issuance of an injunction. *Id.* at 419 (citing *Coventry First, LLC. v. Ingrassia*, No. Civ.A. 05-2802, 2005 WL 1625042, at *11 (E.D. Pa. July 11, 2005)); *see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,*

22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."). Significantly, in this instant case, the parties themselves here recognized in the Agreement these same protectable interests.

In the Agreement, as emphasized earlier, Mr. Atiyeh and Valley agreed that LVL had valid, valuable, and important interests to protect via the restrictive covenants, including but not limited to its relationships with clients/customers/property owners, protection of its confidential information, and protection against unfair competition. Mr. Atiyeh and Valley also agreed that the restrictive covenants are reasonable and necessary to protect those interests. Mr. Atiyeh, Valley, and LVL also agreed that a breach of the restrictive covenants contained in Article VII would cause irreparable injury to those interests such that damages at law will be difficult to ascertain and that monetary damages will not provide an adequate or complete remedy. They further agreed that

> in the event of [their] actual or threatened breach of any one or more of the Restrictive Covenants contained in . . . <u>Article VII</u>, [LVL], in addition to all other rights and remedies at law and in equity, shall be entitled to (and [Mr. Atiyeh and Valley] consent[] to) a temporary restraining order and temporary and permanent injunctions entered by any court of competent jurisdiction enforcing the Restrictive Covenants contained in . . . <u>Article VII</u> against [Mr. Atiyeh and Valley] and restraining and enjoining [Mr. Atiyeh and Valley] from breaching any one or more the Restrictive Covenants, and to recover from [Mr. Atiyeh and Valley] all of [LVL's] reasonable attorney's fees and costs incurred in obtaining such remedies.

Agreement at § 7.4, Bates #677.

Furthermore, as Mrs. Atiyeh testified, her express intention is to ramp the competition up by continuing to "under-sell" LVL if the court does not enjoin her from doing so. Therefore, given applicable case law and the facts of this case, this court finds that LVL will suffer irreparable harm from this unfair competition if the court does not grant LVL a preliminary injunction. *See Tantopia*

*Franchising Co.,* 918 F. Supp. 2d at 417 ("Plaintiff also has suffered irreparable harm to the extent that the Southampton Salon intends to offer tanning services that will directly compete with the services offered by the Tantopia Tanning Center Southampton Salon and the Rockledge Salon.").

### D.      Balance of Harm/Whether Non-Moving Party Will Suffer Greater Harm

The next factor that this court must consider before granting preliminary injunctive relief is the harm the defendants might suffer should the court grant relief. This means the court must undertake to balance the hardships to the respective parties. *Pappan Enters.,* 143 F.3d at 805. The injunction that LVL requests would obligate Mr. Atiyeh and Valley to immediately cease and desist setting up, advising, providing services to, and/or being engaged in the outdoor advertising business, and would require the Flashpoint Defendants to stop engaging in the outdoor advertising business using any billboards and/or assets received or purchased from Mr. Atiyeh and Valley. Compl. at 16. However, such a preliminary injunction would not require the defendants to refrain from maintaining existing or new outdoor signage or on-premise signage for the sole use of Mr. Atiyeh and affiliates for the purpose of advertising a business owned by Mr. Atiyeh or his affiliates in compliance with the restrictive covenants agreed to in the Agreement.

While the Flashpoint Defendants will indeed suffer a loss of revenue if prevented from selling outdoor advertising to those not affiliated with Mr. Atiyeh, any harm suffered by the defendants with respect to this injunction was created or caused by their decision to continue to engage in the outdoor advertising space in violation of the restrictive covenants in the Agreement. Moreover, any hardship will be mitigated because the court will require LVL to post a security bond.

In addition, all defendants are not precluded from advertising the affiliated businesses of Mr. Atiyeh. This will serve to help mollify potential losses to defendants, without violating the

terms of the restrictive covenants. As noted by the court in *Rita's Water Ice Franchise Corp. v. DBI Investment Corp.*, "enforcing the restrictive covenant [as to Rita's Water Ice business] does not force the defendants to go out of business at their present locations; defendants may still sell snack foods such as hot dogs, chips, and soda." No. 96-36, 1996 WL 165518, at *5 (E.D. Pa. Apr. 8, 1996). Here, the defendants may use the existing billboards to promote their own businesses so as to not violate the Agreement's restrictive covenants. After balancing the hardships to the parties, the court finds that granting a preliminary injunction will not result in greater harm to the defendants than the harm suffered or likely to be suffered by LVL in the absence of a preliminary injunction. *See Tantopia Franchising Co.*, 918 F. Supp. 2d at 420 ("In balancing the hardships to the parties, any injury defendants might suffer as a result of the issuance of the preliminary injunction is significantly outweighed by the irreparable harm plaintiff would continue to suffer as a result of defendants' violation of the Non–Compete Covenant.").

### E.    Public Interest

Finally, before this court can issue a preliminary injunction, the court must determine if it serves in the public interest. *Pappan Enters.,* 143 F.3d at 807. "[T]he public interest supports contractual enforcement by preventing competition in violation of a valid restrictive covenant." *Rita's Water Ice Franchise Corp.*, 1996 WL 165518, at *5. The public interest would be served by protecting the contractual interests of the parties in this case. Mr. Atiyeh and Valley freely agreed to certain restrictive covenants in the Agreement, and Mrs. Atiyeh and the Flashpoint Defendants also benefitted from the Agreement and can thus be bound by it. Therefore, this court finds that the public interest supports upholding the contractual rights that the parties willingly negotiated by preventing unfair competition in violation of the restrictive covenants laid out in the

Agreement. Because the court finds that all the elements for granting a preliminary injunction are satisfied in this case, the court will grant LVL preliminary injunctive relief.

## IV.    DISCUSSION ON MOTION FOR DECLARATORY JUDGMENT

### A.    <u>Standard – Motion for Declaratory Judgment</u>

The Declaratory Judgment Act ("DJA") authorizes the court in a case of actual controversy within the court's jurisdiction to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," and "such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201. The DJA "permits a federal court the discretion to 'declare the rights and other legal relations of any interested party seeking such declaration,' when there is a 'case of actual controversy.'" *Abraham v. Del. Dep't of Corr.*, 331 F. App'x 929, 931 (3d Cir. 2009) (quoting 28 U.S.C. § 2201).  In determining whether a declaratory judgment action is sufficiently ripe to constitute a "controversy," the Third Circuit instructs that courts focus on the following factors: (1) "the adversity of the interests of the parties;" (2) "the conclusiveness of the judicial judgment;" and (3) "the practical help, or utility, of that judgment." *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 647 (3d Cir. 1990) (citations omitted).

### B.    <u>Actual Case or Controversy Requirement</u>

The court finds that the actual controversy requirement before this court is met. It does not appear that any of the defendants dispute this issue. In fact, after the evidentiary hearing on the motion for preliminary injunction, the defendants agreed that the court should decide the issues relating to the request for a declaratory judgment at the same time as the preliminary injunction, although the court was initially inclined to wait to rule on the declaratory judgment request. The actual controversy in this matter arises out of the Agreement, which included restrictive covenants

that were a material and valuable part of the contract, as well as the subsequent breach of the restrictive covenants by the defendants. The "[p]arties' interests are adverse where harm will result if the declaratory judgment is not entered." *Travelers Ins. Co. v. Obusek,* 72 F.3d 1148, 1154 (3d Cir. 1995). The instant dispute places the parties in adversity, as harm to LVL will result in terms of market displacement and loss of customers to a competitor if the court does not enter declaratory and injunctive relief.

In addition to having adversity of interest between the parties, the action must be based on a "real and substantial controversy" seeking "specific relief" through a "decree of a *conclusive* character." *Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 412 (3d Cir. 1992) (quoting *Step–Saver Data Sys., Inc.*, 912 F.2d at 649). An action lacks conclusivity if it seeks an opinion "advising what the law would be upon a hypothetical set of facts." *Id.* (quoting *Step-Saver Data Sys., Inc.*, 912 F.2d at 649). In this case, the court finds that the controversy rises to the degree of sufficient immediacy and reality, and not abstract hypotheticals, to warrant the issuance of a declaratory judgment, because LVL has been and will continue to be harmed by the defendants' intention, as expressed to this court by Mrs. Atiyeh, to continue to "under-sell" LVL in the Lehigh Valley outdoor advertising market.

"The final *Step–Saver* factor is the 'practical help, or utility' of a declaratory judgment." *Armstrong World Industries, Inc*., 961 F.2d at 423. "The proper focus of the utility inquiry is the effect of a declaratory judgment on the parties' plans of actions—not *third* parties' plans of action." *Id.* Here, the court finds that judgment on certain core issues will serve to practically help both LVL and the defendants understand the enforceability of the restrictive covenants and to whom they apply. Therefore, the court finds that the issues presented in the motion for declaratory judgment are ripe for adjudication.

Lastly, as a pre-requisite to the entry of declaratory judgment by the court under section 2201, the case of actual controversy must be within the court's jurisdiction. Here, there is no question that this matter falls squarely within the jurisdiction of this court. The diversity jurisdiction statute states in relevant part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--(1) citizens of different States[.]" 28 U.S.C. § 1332(a)(1). All defendants here acknowledged during the hearing held on November 14, 2019 that they were not contesting that the parties are completely diverse.

The court further finds that the amount-in-controversy requirement is also met. The standard for determining whether a plaintiff's claims satisfy the jurisdictional amount in controversy requirement is as follows:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938). Here, LVL has pled in the complaint an amount in controversy exceeding $75,000.00. Compl. at ¶ 8. In applying the "legal certainty" test, 'dismissal is appropriate only if the federal court is certain that the jurisdictional amount cannot be met." *Columbia Gas Transmission Corp. v. Tarbuck*, 62 F.3d 538, 541 (3d Cir. 1995). The court is uncertain that LVL cannot meet the jurisdictional amount, and given the serious allegations in the complaint about the irreparable harm being caused to LVL and given that the sale between Mr. and Mrs. Atiyeh was supposedly for $6,000,000, the court finds that the amount of controversy likely meets the jurisdictional requirement. Therefore, the court has the authority to make certain declaratory judgments in this matter.

## C.     Declaratory Judgment Determinations

In this instant case, LVL poses the following questions to be answered by the court in this case by way of declaratory judgment:

- Is the . . . Agreement a valid and enforceable contract between the parties?

- Under the . . . Agreement, and specifically the Article VII restrictive covenants, can the wife do what the husband has covenanted for valuable consideration not to do?

- Under the . . . Agreement, and specifically the Article VII restrictive covenants, can [Mr.] Atiyeh transfer his ownership interests in a company that owns the subject billboards to his wife, [Mrs.] Atiyeh, so that she may engage in the outdoor advertising business that he may not, without running afoul of the restrictive covenants?

- Is [Mrs.] Atiyeh legally bound by the restrictive covenants in Article VII of the . . . Agreement as a non-signatory who benefited from the . . . Agreement?

- Under the . . . Agreement, is [Mrs.] Atiyeh legally bound by the restrictive covenants because she acted in concert with [Mr.] Atiyeh and Valley when she "purchased" [Mr.] Atiyeh's interest in his billboard assets with full knowledge of the terms of the restrictive covenants in the . . . Agreement?

- Under the . . . Agreement, is [Mrs.] Atiyeh legally bound by the restrictive covenants as a successor in interest to [Mr.] Atiyeh with respect to the billboards?

- Was the "transaction" as actually documented between husband and wife in this case permitted under the . . . Agreement, or was it of no legal effect and a nullity, being instead a sham, fraudulent conveyance employed as an artifice to circumvent the Article VII restrictive covenants of the . . . Agreement?

- If the "transaction" as constituted was of no legal effect and is a nullity under the . . . Agreement, is [Mr.] Atiyeh, as the owner of Manor Signs, LLC, liable for breach of the non-compete provisions under the . . . Agreement for any third-party outdoor advertising that occurred on the billboards thereafter?

- Does "transferring" the billboard assets from the former "professional billboard operator" husband to a wife with zero experience or assets in the outdoor advertising business with no monetary consideration being exchanged, along with providing her rent-free office space out of which to run the business, constitute "setting her up in" the outdoor advertising business, when but for said

provision of said billboards she would not be engaged in the outdoor advertising business?

- Did the Notice of Right of First Refusal dated April 30, 2019 relieve Defendants of their obligations to comply with the non-compete provisions of Article VII of the . . . Agreement?

- To what extent are the agreed-upon remedies in the event of breach of the non-compete provisions as set forth in the . . . Agreement enforceable by the Court?

Pl.'s Br. in Supp. of Decl. J. in Favor of Pl. ("Pl.'s Decl. J. Br.") at 22–24, Doc. No. 59. Here, the court has already answered a number of these questions in the preliminary injunction analysis. Nonetheless, for the sake of completeness and clarity, the court briefly addresses these questions again in turn.

First, the court declares that the Agreement is a valid and enforceable contract between the parties. As stated previously, it does not appear that any of the defendants challenge the existence or validity of the Agreement. Furthermore, the court has already determined that the covenants not to compete are enforceable generally, as the only challenges seem to be to the specific application of the restrictive covenants.

Second, the court has already addressed whether a wife can do what her husband has covenanted not to do under the restrictive covenants. As the court explained, persuasive case law leads the court to the conclusion that a wife cannot do what her husband has covenanted not to do if the wife has obtained the benefits of the covenant. *See Suburban Oil Service, Inc.*, 63 Pa. D. & C.2d at 92. In this case, Mrs. Atiyeh obtained the benefits of the covenants by virtue of her joint tax status and by virtue of a free advertising credit. This leads the court to conclude with respect to question three, that Mr. Atiyeh cannot transfer his ownership interests in a company that owns the subject billboards to his wife, so that she may engage in the outdoor advertising business which he is banned from engaging in, without running afoul of the restrictive covenants.

Concerning question four, the court has already found that Mrs. Atiyeh is legally bound by the restrictive covenants in Article VII of the Agreement since she benefitted from the Agreement. Regarding question five, Mrs. Atiyeh acted in concert with her husband when she purchased the billboard company as the transaction itself was infused with factors indicating the two parties were colluding, even excluding the fact that the two parties are married, such as the fact that Mrs. Atiyeh relied on Mr. Atiyeh's lawyer as opposed to having her own counsel for disclosures and that Mrs. Atiyeh did no due diligence regarding the permits of the billboards she was purchasing.

Question six poses the issue of whether Mrs. Atiyeh can be legally bound by the restrictive covenants as a successor in interest to Mr. Atiyeh with respect to the billboards. A purchaser of business assets can be considered a successor in interest to the former owner's obligations if:

> (1) The successor . . . either expressly or impliedly agreed to assume the liabilities of the transferor . . .;

> (2) The sale transaction is, in effect, a consolidation or merger;

> (3) The successor . . . is merely a continuation of the transferor . . .;

> (4) The transaction is fraudulently entered into in order to escape liability;

> (5) The sale or transfer was not made for adequate consideration and provisions were not made to protect creditors of the transferor . . .;

> (6) As applied to tort claims sounding in strict liability, the successor undertakes to conduct the same manufacturing operation of the transferor's product line.

*Carlos R. Leffler, Inc. v. Hutter*, 696 A.2d 157, 167 (Pa. Super. 1997). Here, as previously established by the court and as pertaining to the fourth factor, the evidence presented demonstrates that the sale between Mr. and Mrs. Atiyeh was not made for adequate consideration, as they did not actually exchange any money. However, provisions were made to protect creditors, as Mr. Atiyeh agreed in the Promissory Note and the Sale, Transfer and Assignment Agreement that he would remain personally obligated to pay the preexisting, outstanding loans for Manor Signs, LLC,

which totaled $1,144,809. Although provisions were not made to protect LVL, LVL is not a creditor. While LVL argues that all six of these factors are demonstrated by the record in this matter, when only one is needed, the court disagrees. *See* Pl.'s Decl. J. Br. at 65. The evidence did not show that Mrs. Atiyeh agreed to assume the liabilities of the transferor, as evidenced by the fact that Mr. Atiyeh remained responsible for the loan. The sale was not a consolidation or merger, and the court at this time cannot find that Mrs. Atiyeh is merely a continuation of Mr. Atiyeh's and Valley's business. While the evidence appears to show that the transaction was fraudulently entered into, the purpose of the transfer appears to be for violating the non-compete provisions in the Agreement, not to escape already existing liability. Factor six also does not apply as the transaction did not apply to a tort claim sounding in strict liability. Therefore, the court finds that Mrs. Atiyeh is not bound by the restrictive covenants through a theory of successor in interest.

As to questions seven and eight, the court has already established that the transaction was invalid, and Mr. and Mrs. Atiyeh employed it to circumvent the Article VII restrictive covenants of the Agreement. Therefore, Mr. Atiyeh is liable for breach of the non-compete provisions under the Agreement for any third-party outdoor advertising that occurred on the billboards. Regarding question nine, Mr. Atiyeh approaching his wife about the sale, and then "selling" her the billboard business for no actual consideration, constitutes setting her up in the outdoor advertising business in violation of the restrictive covenants. As previously explained, the notice of the right of first refusal in no way relieves any of the defendants of their obligations to comply with the non-compete provisions of Article VII of the Agreement.

Lastly, in terms of the agreed-upon remedies, this court has already determined that a preliminary injunction is enforceable by this court. The parties to a contract may prescribe for and agree upon the remedies available for a breach of their agreement within the contract itself. *See*

*John B. Conomos, Inc. v. Sun Co., Inc. (R&M)*, 831 A.2d 696, 708 (Pa. Super. 2003) ("Notwithstanding the characterization of a breach as a bad faith breach or otherwise, the contract may prescribe for the remedies available for such breach. To the extent that the cause of action and remedies remain within the province of contract law, the contract may be binding in the determination of the consequences of the breach."). "[C]ontracts should be made by the parties, not by the courts, and hence ... remedies for breach of contract must have a basis in the agreement of the parties." *Reed v. Pittsburgh Bd. of Public Educ.,* 862 A.2d 131, 136 (Pa. Commw. 2004) (quoting Restatement (Second) of Contracts § 33 cmt. b (1979)).

Here, Mr. Atiyeh and Valley consented to a temporary restraining order and temporary and permanent injunctions entered by a court of competent jurisdiction enforcing the restrictive covenants, and allowing for the recovery of LVL's reasonable attorney's fees and costs incurred in obtaining such remedies. As the court already explained, the Flashpoint Defendants can be enjoined as well. The question then becomes whether LVL is entitled to its reasonable attorney fees in obtaining the preliminary injunction.

In Pennsylvania, attorney's fees are generally not recoverable as a component of damages. *Mosaica Academ. Charter Sch. v. Commonwealth*, 813 A.2d 813, 822 (Pa. 2002). There are three exceptions to the general rule: (1) express statutory authorization, (2) a clear agreement of the parties, or (3) some other established exception. *Id.* (citing *Lavelle v. Koch*, 617 A.2d 319 (Pa. 1992)). The second exception allows "courts to award attorney's fees when there is a clear agreement between the parties that attorney's fees will be awarded, such as an agreement that attorney's fees will be awarded as a component of damages if incurred during a declaratory judgment action to establish a party's rights under the contract." *Precision Door Co., Inc. v. Meridian Mut. Ins. Co.,* 353 F. Supp. 2d 543, 558 (E.D. Pa. 2005).

The Third Circuit has also concluded that attorney's fees are awardable in the preliminary injunction context:

> Belair and BNRV's agreement provides for attorneys' fees to BNRV in the event of an enforcement suit. In Pennsylvania, "parties may contract to provide for the breaching party to pay the attorney fees of the prevailing party in a breach of contract case" as long as such fees are "reasonable." *McMullen v. Kutz*, 603 Pa. 602, 985 A.2d 769, 776–77 (2009). . . . Here, although proceedings on the underlying claims remain, the District Court has made its final assessment of the propriety of the preliminary injunction. The preliminary injunction if validly issued is enough to render BNRV a prevailing party because it "alter[s] the legal relationship among the parties in a manner that afford[s] plaintiffs substantial relief on the merits of their claims." *Id.* Under a valid preliminary injunction, BNRV will have received what it sought: enforcement of restrictions on Belair's employment for almost the entire the period it requested. Pennsylvania law does not bar an award of attorneys' fees to a party in this posture.

*Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 344 (3d Cir. 2019). Similarly, in this case, the Agreement provides that if there is a breach, LVL can "recover from Atiyeh/Seller all of Buyer's reasonable attorney's fees and costs incurred in obtaining such remedies." Agreement at § 7.4, Bates #677. Here, although proceedings on the underlying claims remain, the court is entering a preliminary injunction, and LVL has preliminarily achieved the relief which it sought. As such, Pennsylvania law does not bar an award of attorneys' fees.

Nevertheless, although LVL asks for a declaratory judgment on this very issue, the defendants have not fully put forth a defense to LVL's request for attorney's fees and other damages. Therefore, the court will not enter declaratory judgment on the issue of damages at this time, and LVL's request for attorney's fees is denied without prejudice to give all parties the opportunity to fully brief this issue. *See Sandhills Glob., Inc. v. Garafola,* Civ. A. No. 19-20669 (MAS) (TJB), 2020 WL 1821422, at *14–15 (D.N.J. Apr. 10, 2020) ("The APA Restrictive Covenant provides that '[Sandhills] shall be entitled to recover from [Garafola] its reasonable attorneys' fees and out-of-pocket expenses incurred; in enforcing provisions of the agreement.

Here, Sandhills preliminarily achieved the substantive relief it sought. Defendants have not, however, put forth any defense to Sandhills's request. Sandhills's requests [sic] is, accordingly, denied without prejudice in order to afford the parties the opportunity to fully brief the issue." (alterations in original) (internal citation omitted)). Accordingly, LVL may file a separate motion for attorney's fees which includes appropriate documentation of fees and expenses, and all defendants will have the opportunity to oppose this motion. At this time, because the issue of damages generally has not been fully briefed and up-to-date documentation has not yet been submitted to the court, the court declines to issue a declaratory judgment on this issue.

## V.    CONCLUSION

To obtain a preliminary injunction, LVL is required to clearly show that it is entitled to this extraordinary remedy. Regarding LVL's breach of contract, intentional interference with performance of contract by a third person, and conspiracy claims, it has demonstrated that it is likely to succeed on the merits of these claims. Additionally, LVL has demonstrated that it is likely to suffer irreparable injury if the court does not issue a preliminary injunction, and the court's balancing of the parties' respective harms and consideration of whether a preliminary injunction is in the public interest all support the granting of relief. Accordingly, the court will grant the motion for a preliminary injunction, with the caveat that the billboards at issue in this litigation can continued to be used to advertise affiliated businesses of Mr. Atiyeh and Valley. The court also enters declaratory judgment with respect to several of the issues raised by the parties.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.